ALPIN J. CAMERON, WILLIAM P. DENEGRE, AND ALPIN W. CAMERON, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 9686.    Promulgated September 19, 1927.

1. When in 1920 one partnership is succeeded by another partnership and the interests of the members continue substantially as before with the exception of a gift by one of the partners of his partnership interest to a new partner and a change in the distributive shares of the partnership income, no new basis for computing the allowance for exhaustion, wear and tear to the partnership arises.

2. The March 1, 1913, value of depreciable assets determined upon the basis of cost less accrued depreciation instead of upon the basis of a retrospective appraisal made in 1926 of cost of reproduction new less an estimated amount for depreciation.

3. Depreciation previously claimed by the partnership of which petitioners are members and allowed by the Commissioner in computing the taxable income for prior years must be taken into consideration in arriving at the capital costs which are yet subject to recovery through a depreciation allowance for the years 1920 and 1921.

*J. Robert Sherrod, Esq.*, and *B. E. Hinton, Esq.*, for the petitioners. *M. N. Fisher, Esq.*, for the respondent.

The Commissioner determined deficiencies in income taxes as follows: Alpin J. Cameron, $21,665.31 for 1920 and $13,904.16 for 1921; William P. Denegre, $15,203.16 for 1920 and $29,019.91 for 1921; and Alpin W. Cameron, $10,921.17 for 1920 and $6,860.40 for 1921.

FINDINGS OF FACT.

The business of A. J. Cameron & Co. was begun prior to 1891. In that year a new partnership was organized composed of Alpin J. Cameron and William P. Denegre, trading as copartners under the name of A. J. Cameron & Co. With various changes of location,

this partnership continued until January 1, 1920, when, by oral agreement, Alpin W. Cameron, son of Alpin J. Cameron, was admitted to a share in the partnership earnings, the distributive shares after this time being: William P. Denegre, 40 per cent; Alpin J. Cameron, 35 per cent; and Alpin W. Cameron, 25 per cent. At this time, Alpin J. Cameron made a gift to his son, Alpin W. Cameron, of $250,000 which was accomplished by a transfer from the capital account of the former on the books of A. J. Cameron & Co. to a similar account of the latter on the same books. No change was made at this time of the asset values on the books of A. J. Cameron & Co.

The business of the partnership is that of a wool-spinning plant, producing yarn and tops.

In 1903 the partnership erected a three-story mill building of the type known as "slow-burning construction," with stone foundations, heavy brick walls, wood interior, and slag roof, at a cost of $115,-880.66. Capital expenditures on this building in 1910 of $3,282.47 added to the original construction cost made a total cost on March 1, 1913, of $119,163.13. The greater part of the machinery installed in this building was purchased new in 1903, though a small part was transferred from buildings previously rented by the partnership. The books of account show a total cost of machinery at March 1, 1913, of $310,525.93, which includes additions from 1903 to 1913. The total plant account on March 1, 1913, was $429,689.06—buildings, $119,163.13, and machinery, $310,525.93.

In 1915, another mill building and a warehouse of the same type of construction as the first building, were erected at a cost of $87,-736.40, which, with certain other later costs of $278.77, constituted total building costs subsequent to 1913 and prior to December 31, 1919, of $88,015.17. No additional building costs were incurred in 1920 and 1921. Machinery and equipment were acquired after March 1, 1913 as follows:

| | | | |
|---|---|---|---|
| 1913 | $8,548.40 | 1918 | $15,624.83 |
| 1914 | 6,983.64 | 1919 | 19,047.39 |
| 1915 | 13,917.38 | 1920 | 29,799.65 |
| 1916 | 70,877.79 | 1921 | 8,745.29 |
| 1917 | 32,068.90 | | |

Depreciation was computed by the partnership at a composite rate for each of the years prior to 1920 as follows:

|  | Per cent |
|---|---|
| 1903 to 1912, inclusive | 6 |
| 1913 to 1915, inclusive | 8 |
| 1916 | 10 |
| 1917 to 1919, inclusive | 20 |

The depreciation allowance as determined at the above rates was used in computing net income on the partnership books. The total

depreciation reserve on the partnership books at December 31, 1916, was $374,567.15 and the total cost of depreciable assets to this date was: buildings, $207,178.30, and machinery and equipment, $410,-853.14. The rate of 20 per cent as shown for 1917 to 1919, inclusive, was reduced by the Commissioner in determining the taxable income for these years, the result being an allowance of depreciation deductions as follows: 1917, $56,690.74; 1918, $78,126.49; and 1919, $81,-382.13. The rates of 8 per cent from 1913 to 1915 inclusive and 10 per cent for 1916 were not disturbed by the Commissioner for these years. The depreciation set up on the partnership books to December 31, 1916, together with depreciation allowed by the Commissioner for the three subsequent years, made a total of depreciation to December 31, 1919, of $590,766.51. The cost of depreciable assets to December 31, 1919, was $684,772.56—buildings, $207,178.30; machinery and equipment, $477,594.26.

The Commissioner, in his determination, segregated the total depreciation reserve at December 31, 1916, of $374,567.15 which appeared on the books in a lump amount as applicable to the plant account and showed $107,019.19 as applicable to buildings and $267,-547.96 as applicable to machinery and equipment. To these amounts was added the depreciation allowed by him on these two classes of assets in three succeeding years which produced the following depreciation reserves at December 31, 1919; buildings, $132,594.12, machinery and equipment, $458,172.38. The Commissioner, in computing allowable depreciation for 1920 and 1921, eliminated $464,-607.67 from the machinery and equipment account on account of acquisitions made prior to December 31, 1916, which he considered fully depreciated before the end of 1920, the allowance on these assets in 1920 being the unextinguished balance at January 1, 1920. No depreciation was allowed on these assets in 1921, though depreciation was allowed on additions which were made subsequent to January 1, 1917. The depreciation thus allowed by the Commissioner in 1920 and 1921 was as follows:

|  | 1920 | 1921 |
|---|---|---|
| On buildings | $5,130.10 | $5,145.23 |
| On machinery and equipment | 14,297.93 | 5,106.03 |
|  | 19,428.04 | 10,251.26 |

The plant and the machinery were at all times kept in first-class condition, the partners being unusually thorough in making inspections of the plant and seeing to it that necessary repairs were made. At least annually all machines were taken down, reassembled and placed in proper alignment in order that a high state of operating efficiency might be maintained. A machine shop, with a greater

number of mechanics than is normally employed by similar plants, was maintained, its function being to repair and replace defective or worn parts of machinery and equipment.

A high state of operating efficiency maintained in the plant was reflected in a product which was of such character that no advertising as such was necessary for its sale, the only advertising being derived from the location of the plant near the main line of the Pennsylvania Railroad into Philadelphia, on which plant was placed the name "A. J. Cameron and Company" and title of the business in large letters, and from the character of the product manufactured.

The buildings at the time of construction were the most advanced mill type and are still entirely suitable for the purpose for which they are used. They receive unusual care in the way of pointing up the masonry and making such repairs as are possible to arrest deterioration. Obsolescence is a negligible factor. The useful life of the buildings so maintained is not less than 50 years.

The machines used by the partnership are still modern and up-to-date. Practically all machines installed in 1903 and subsequent thereto were in use in 1926. There has been little, if any, change in the design and construction of wool-spinning machinery since prior to 1903, the only improvements in machinery of this type being by way of attachments designed to be placed upon existing machines of the type used by A. J. Cameron & Co. The fast-moving and rapidly depreciating parts have been and are being repaired and replaced continually. Such repairs and replacements are charged to expense by the partnership and taken as a deduction in computing taxable income. Obsolescence has been of minor consequence in connection with wool-spinning machinery and equipment of this type. The average useful life of the machinery maintained in the high state of repair peculiar to this taxpayer would not be less than 33⅓ years.

The sales, invested capital, depreciation used in computing net income, and the net income of the partnership for the nine years next prior to January 1, 1913, were as follows:

| Year | Sales | Invested capital | Net income | Depreciation deducted in computing net income | Rate of depreciation, per cent |
|---|---|---|---|---|---|
| 1904 | $1,095,894.84 | $389,228.33 | $50,384.58 | $17,571.90 | 6 |
| 1905 | 1,393,233.65 | 423,247.51 | 71,335.40 | 18,807.49 | 6 |
| 1906 | 1,522,303.38 | 461,398.05 | 107,857.76 | 20,341.43 | 6 |
| 1907 | 1,461,139.97 | 531,894.18 | 137,652.54 | 21,456.25 | 6 |
| 1908 | 1,437,081.28 | 622,744.33 | 126,049.34 | 21,805.94 | 6 |
| 1909 | 2,277,489.80 | 706,477.27 | 241,932.09 | 22,428.56 | 6 |
| 1910 | 1,421,974.05 | 913,161.04 | 80,480.12 | 24,331.69 | 6 |
| 1911 | 1,455,840.65 | 947,254.10 | 124,637.25 | 25,485.32 | 6 |
| 1912 | 2,002,426.54 | 989,432.60 | 171,660.35 | 25,713.48 | 6 |
| Total, 9 years | 14,067,384.16 | 5,984,837.41 | 1,111,989.43 | 197,942.06 | |
| Average | 1,563,042.68 | 664,981.93 | 123,554.38 | 21,993.56 | |

The average net taxable income of the partnership for the five years next preceding January 1, 1920, was $476,997.82 on an average invested capital as shown by the books of $1,415,544.37.

No salaries were drawn by the partners or used in computing net income until 1917, when a salary of $7,000 for each of the two partners was arrived at on the basis of the saving in tax for 1917 which would be effected by such salaries.

## OPINION.

LITTLETON: The primary error assigned in this proceeding is the failure of the Commissioner to allow adequate depreciation for the years on appeal.

As the basis for this claim, the petitioners contend, first, that since the partnership which was formed in 1891 was dissolved and a new partnership came into existence on January 1, 1920, when A. W. Cameron was admitted to membership, there should be a revaluation of the assets of the partnership on January 1, 1920, for depreciation purposes in determining the distributive income of the partnership.

Granting that there was a new partnership created on January 1, 1920, should there be a revaluation of assets on this date for the purpose of determining the partnership income which is taxable to the partners?

Section 218 (d), Revenue Act of 1918, provides the basis for determining partnership income as follows:

The net income of the partnership shall be computed in the same manner and on the same basis as provided in section 212 except that the deduction provided in paragraph (11) of subdivision (a) of section 214 shall not be allowed.

The exception mentioned above, section 214 (a) (11), refers to charitable contributions, etc., which are not material to a decision of the question at issue.

Section 212, Revenue Act of 1918, provides in part that:

(a) That in the case of an individual the term "net income" means the gross income as defined in section 213, less the deductions allowed by section 214.

Section 214, Revenue Act of 1918, provides in part that:

(a) That in computing net income there shall be allowed as deductions:

*       *       *       *       *       *       *

(8) A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence.

Under the foregoing provisions the depreciation allowable to a partnership should be determined on the same basis as for an individual. The transaction which petitioners claim gave rise to a new

basis for depreciation, occurred after March 1, 1913, and, therefore, we have only the question to consider of whether a new cost arose on January 1, 1920, which may be used as a basis for depreciation. In other words, would the dissolution of the partnership which existed prior to January 1, 1920, and the creation of a new partnership on January 1, 1920, under the circumstances of this case, give rise to a new cost for depreciation purposes?

Two partners constituted the partnership prior to January 1, 1920, and these same partners continued to be members of the partnership which existed after a third partner had been admitted on January 1, 1920. No additional funds were paid in at this time, the capital account of the new partner being created by a transfer from the capital account of one of the old partners, Alpin J. Cameron. The other partner, Denegre, continued with the same investment as before. The change of consequence for all the partners at the time was that the income would thereafter be distributed on the basis of 40 per cent to W. P. Denegre, 35 per cent to Alpin J. Cameron and 25 per cent to A. W. Cameron.

There was no sale or transfer by the old partnership to the new partnership of the assets of the old partnership. Unlike a corporation, a partnership does not for tax purposes exist separate and apart from the partners. There is nothing to indicate that there were any transfers of any kind with respect to the ownership of the property here in question, such as would have been necessary had a corporation been succeeded by a corporation or by a partnership. The old partners had an interest in a partnership and this interest continued without interruption when the new partnership was created—at least this was true as far as Denegre was concerned. Not only did the old partnership sell nothing, but also the same was true of Denegre. The other old partner, Cameron, gave a part of his interest to his son, but in so far as the remaining part was concerned, there was no change of ownership whatever.

The status of a partnership under the Revenue Act of 1913, is defined in *United States* v. *Coulby*, 251 Fed. 982, which would be equally applicable under the Revenue Act of 1918, since in both instances a partnership is not taxed as such. The court said:

This law, therefore, ignores for taxing purposes the existence of a partnership. The law is so framed as to deal with the gains and profits of a partnership as if they were the gains and profits of the individual partner. * * * The law looks through the fiction of a partnership and treats its profits and its earnings as those of the individual taxpayer. Unlike a corporation, a partnership has no legal existence aside from the members who compose it. The Congress, consequently, it would seem, ignored, for taxing purposes, a partnership's existence, and placed the individual partners share in its gains and profits on the same footing as if his income had been received directly by him without the intervention of a partnership name.

The conclusion reached by the district court was later affirmed by the circuit court of appeals in *United States* v. *Coulby*, 258 Fed. 27. See also, *J. H. Goadby Mills*, 3 B. T. A. 1245, in which the Board said:

In the enactment of section 218 (a) Congress ignored for taxing purposes the existence of the partnership and framed the law so as to treat the gains and profits of the partnership as if they were gains and profits of the individual partners. Unlike a corporation, a partnership has no legal existence aside from the members who compose it; consequently, in order that the profits of the partnership might not escape taxation, Congress provided that its income should be taxed to the individual partners, the same as if they had received it direct without the intervention of the partnership.

The Board is of the opinion that for the purpose of determining income of a partnership under the Revenue Act of 1918 the partnership must be viewed from the standpoint of the individual partners who compose it, and not as a legal entity of itself.

When considered in this manner, we fail to see where there can be any new basis of depreciation for the interests of the partners which existed in the old partnership and continued in the new partnership. These partners neither bought nor sold anything at this time. There was no new cost to them and, consequently, no new basis for depreciation which has for its purpose the recovery of capital outlay before taxing income.

With respect to the new partner who received a gift on January 1, 1920, of an interest in the partnership business of $250,000, we are unable to determine a different depreciation allowance thereon other than the allowance which the Commissioner has made in computing the net income of the partnership, for the reason that we do not know what depreciable assets, if any, he acquired. In *Abraham B. Johnson*, 7 B. T. A. 820, we held that the basis for depreciation in the case of a gift was the fair market value of the depreciable property at the date of the gift. Assuming the most *favorable* position for this petitioner, namely, that he constructively received $250,000 from his father and this was used to purchase an interest in the partnership, we would still be unable to provide a basis for the return of this capital to him for the reason that we do not know that this amount was invested in depreciable property alone. We only know that after January 1, 1920, he was entitled to receive 25 per cent of the future earnings of the partnership. Was it an acquisition of depreciable tangible property alone or was it an interest in the entire business, including both depreciable and nondepreciable assets? The evidence fails to show what depreciable assets, if any, were acquired and, therefore, we must deny any deduction for depreciation on account thereof.

In view of the above conclusions, it becomes unnecessary to determine the value of the assets on January 1, 1920.

The next issue relates to the March 1, 1913, value of assets for the purpose of computing the allowance for depreciation. The evidence with respect to the March 1, 1913, value, consisted almost entirely of a retrospective appraisal made in 1926 upon the basis of cost of reproduction less an estimated amount for depreciation, which was explained in some detail by the men who did the greater part of the work in its preparation. At the same time there was presented testimony relating to a similar appraisal for the purpose of showing the value of the plant in question on January 1, 1920, and the greater portion of the evidence of value, outside the two appraisals, was directed at showing the increase in value from March 1, 1913, to January 1, 1920, and the value on January 1, 1920. What evidence we have tends to show small, if any, increase in value over cost from 1903 and intervening years to March 1, 1913.

One witness for the petitioners testified that there was no fluctuation in prices during the period 1903 to 1913, and another that 1913 was a normal year with prices " slightly less " in 1903 than in 1913. Upon further questioning, the latter stated that in his opinion 1903 prices were about 90 per cent of 1913 prices. This same witness, who holds an important position with the appraisal company which prepared the appraisals, though he was not connected with the making of appraisals here in question, placed a fair market value on depreciable assets of the partnership of $397,000, which is only $62 in excess of the net replacement cost fixed by the appraisal itself. The gross replacement cost fixed by the appraisal, represents an increase over original cost of approximately 32 per cent.

While it was shown at the hearing that the partnership made an inventory of its assets at the end of 1912 for the purpose of determining the assets on hand at that time, this inventory was neither availed of by the appraisers for the purpose of checking the correctness of the inventory which they made in 1926 as to March 1, 1913, by working back an inventory made in 1926, through a process of additions and eliminations, nor was it introduced in evidence to enable the Board to make a check. One of the difficulties which frequently arises in the making of a retrospective appraisal is the determination of the assets which were on hand at a much earlier date than that on which the appraisal is being made—in this instance 13 years. Obviously, the percentage of error may be high for many reasons.

In this proceeding we are not dealing with a situation where there is any contention made that the costs of assets on hand at March 1, 1913, are not reflected by the books; on the contrary, at the hearing much stress was laid on the accuracy with which the books were kept

and the detail shown therein. The basic contention appears to be that replacement cost at March 1, 1913, less depreciation to March 1, 1913, both as determined by the retrospective appraisal, should be accepted in lieu of costs as reflected by the partnership books for the purpose of computing depreciation.

Upon a consideration of all the evidence, we are not convinced that the March 1, 1913, value as determined by the retrospective appraisal, represents as nearly accurate fair market value as that which is represented by cost of the depreciable assets as reflected by the partnership books, less proper depreciation to March 1, 1913. This case is easily distinguishable from *Paducah Water Co.*, 5 B. T. A. 1067, to which we are referred by the petitioners, as many of the corroborative factors which led to the acceptance of a retrospective appraisal in that instance are not present here.

The cost of the depreciable assets to the partnership from 1903 to March 1, 1913, was $429,689.06 and we are satisfied from the evidence that a reasonable reserve for depreciation at this date would be $128,906.72. This results in a depreciated cost on March 1, 1913, of $300,782.34, which we believe from a consideration of all of the evidence should be accepted in this case as the best evidence of the fair market value on this date.

The next question is whether, in determining the depreciation allowance for 1920 and 1921, the Commissioner was in error in eliminating depreciable assets (machinery and equipment) from the partnership's plant account in 1920 and 1921, to the extent of $464,607.67, on the ground that assets to this extent had been fully depreciated on the partnership books. At January 1, 1917, the partnership had on its books a depreciation reserve of $374,567.15, which had been set up from 1904 to 1916 by the use of composite rates ranging from 6 per cent from 1904 to 1912, and 8 per cent from 1913 to 1915, to 10 per cent in 1916. The depreciation thus determined was used in computing income on the partnership books and at least for the last four years was claimed and allowed as a deduction in determining taxable income. The Commissioner segregated this depreciation reserve as between buildings and machinery and equipment, and added to the two reserves the depreciation which he allowed on these classes of assets for 1917, 1918, and 1919. Since the total of the depreciation reserve for machinery and equipment at January 1, 1920, was only slightly less than the costs incurred for machinery and equipment prior to January 1, 1917, as determined by him, only the remainder was allowed as a deduction for depreciation in 1920 on these assets, and no depreciation was allowed on such costs for 1921.

The evidence adduced at the hearing was conclusive to the effect that not only were practically all these assets on hand and in use in 1920 and 1921, but also that they were in use and rendering satisfactory service in 1926. Further, we have found as a fact that a composite rate of 3 per cent, or a life of 33⅓ years, was reasonable for these assets, under the maintenance policy pursued by this partnership. This rate, on the evidence, is reasonable when the unusual repair and maintenance policy of the partnership and the expert testimony offered by the petitioners are considered. It is, therefore, apparent that an elimination of these assets, because their useful life had expired in 1920, would not be justified.

On a consideration of this question, the Board is of the opinion that the fact of the existence of the assets and their continued use in the business is not alone sufficient to justify a depreciation allowance in the taxable years, but that due regard must also be had to the extent to which recovery has already been had of their value on March 1, 1913, of assets acquired prior thereto, and of costs of assets acquired subsequent to this date. Depreciation at best is an estimate. *Pierce-Arrow Motor Car Co.*, 2 B. T. A. 396. Its purpose is to provide a return of capital before taxing income. *Richmond Dairy Lunch*, 1 B. T. A. 876; *Gladding Dry Goods Co.*, 2 B. T. A. 336; *United States* v. *Ludey*, 274 U. S. 295. Under the Revenue Act of 1918, a taxpayer's capital which he is entitled to recover before taxing income is the value as it existed on March 1, 1913, of assets acquired prior to this date, if such value is greater than cost, and cost of assets acquired subsequent to March 1, 1913. *Even Realty Co.* 1. B. T. A. 355; *J. J. Gray, Jr.*, 2 B. T. A. 672. In this proceeding we have determined the fair market value at March 1, 1913, in an amount not less than cost after adjustment for depreciation to this date. This amount the petitioners are entitled to have recovered to them as well as subsequent costs before taxing income, but in no greater amount than the sum total of the March 1, 1913, value and subsequent costs. As we said in *Even Realty Co., supra*, " The Constitution certainly does not entitle a taxpayer to recover any part of his cost more than once, before becoming accountable for taxes upon his gain."

We have found that the value on March 1, 1913, is represented by a cost on this date of $429,689.06 less a depreciation reserve of $128,906.72. From March 1, 1913, to December 31, 1916, depreciation was claimed by the petitioners and allowed by the Commissioner in the computation of taxable income in the approximate amount of $162,200.27. (This amount is referred to as " approximate " since only the rates claimed and allowed were furnished, though the application of the rates to cost furnishes this amount,

which is a close approximation to the difference between the depreciation reserve on the books at December 31, 1916, and the depreciation computed on the books prior to March 1; 1913.) By adding to the latter amount the depreciation reserve on March 1, 1913, we arrive at a depreciation reserve on December 31, 1916, of $291,-106.99. The Commissioner made a segregation as between buildings and machinery and equipment of the total reserve on the books at this time on a basis which appears reasonable, and which, when applied to the foregoing total, produces the following result: buildings, $83,173.43, machinery and equipment, $207,933.56. For 1917, 1918, and 1919, a composite rate of 20 per cent was claimed for depreciation, though this was reduced by the Commissioner to the extent that a total was allowed on buildings in those years of $25,574.93 and on machinery and equipment of $190,624.42. When these amounts are added to the depreciation reserve as previously shown at December 31, 1916, we find accumulated reserves at December 31, 1919, as follows: buildings, $108,748.36, machinery and equipment, $398,557.98. Costs of buildings at December 31, 1919, were $207,178.30 and of machinery and equipment, $477,594.26.

When returns for the years 1913 to 1919 were filed, an amount was claimed as representing a *reasonable allowance* for depreciation under the provisions of the statutes then in force, and in all cases the allowances made by the Commissioner were no greater than those claimed by the petitioners—in 1917, 1918, and 1919 they were substantially less. In those years the petitioners knew as well as they now know the conditions surrounding the property, its useful life in the business, and what would be a reasonable allowance for the exhaustion, wear and tear thereof. All we know is that for the years 1917, 1918, and 1919 when the tax rates were high, the partnership claimed and insisted upon an allowance of 20 per cent for depreciation. What evidence was presented, or · upon what consideration the parties acted to determine the reasonableness of the allowances finally made we do not know. The fact is that the parties arrived at allowances which both accepted then as reasonable, and from the evidence before us we can not say that it was unreasonable or excessive, notwithstanding it is now shown that the machinery had a useful life greater than the period of usefulness in the business upon which the allowances in 1917, 1918, and 1919 were made. The Board will not lightly conclude that deductions from gross income in prior years through allowances for exhaustion, wear and tear of property used in the trade or business were unwarranted and excessive, and direct adjustment thereof so that a taxpayer may in subsequent years secure the benefit of a greater deduction from income for exhaustion, wear and tear than to which he would otherwise be entitled. We have held that we will not permit the Commissioner

to adjust invested capital for taxable years upon the ground that the taxpayer has taken inadequate depreciation in prior years, in the absence of a clear showing that the depreciation charged upon the books or claimed in the returns was inadequate. *Russell Milling Co.,* 1 B. T. A. 194; *Cleveland Home Brewing Co.,* 1 B. T. A. 87; *Rub-No-More Co.,* 1 B. T. A. 228. And, when a taxpayer claims that the Board should go back and redetermine the useful life of the property and recompute the depreciation allowance over a long period of years long since barred by the statute of limitation, so that he may obtain a greater deduction from income in the taxable year, and in fact obtain the benefit of a double deduction from income, he must satisfy the Board by clear and convincing evidence that he is in justice entitled to such adjustment. The allowance of the deduction from income for exhaustion, wear and tear of property is for the benefit of the taxpayer and when he has been given a liberal allowance in prior years, when the tax rates were high, he should not be heard to say upon a mere showing that in the taxable years the property is still in use and giving good service, that the depreciation claimed and allowed after a full consideration of the facts in prior years should be disregarded and an allowance made which will permit of the exhaustion of the same or a portion of the capital investment the second time. Our allowance for the years involved will, therefore, be predicated on the proposition that the allowances from 1913 to 1919 were reasonable, and that recoveries of capital to this extent have been made which will not again be permitted in a later year.

There is no controversy between the Commissioner and the petitioners as to buildings, the controversy arising on account of an elimination from the capital account of machinery and equipment which the Commissioner considered fully depreciated and the consequent disallowance of depreciation thereon. As shown above, the depreciation reserve for machinery and equipment at March 1, 1913, plus the depreciation asked for and granted from this date to December 31, 1919, leaves an unextinguished balance in this account at December 31, 1919, of $79,036.28. The evidence before us is insufficient to show that specific assets were actually depreciated out and, therefore, would be subject to elimination, since a composite rate was used by the partnership for all assets. On the other hand, we have found that under the circumstances of this case, a composite rate of 3 per cent, or a life of 33⅓ years would be reasonable for these assets. On a weighted-average basis, there would be an unexpired life as applicable to the assets on hand on December 31, 1919, of approximately 22 years. An allowance of 3 per cent on the total cost of assets would extinguish the assets long before the expiration

of their useful life. The Board is, therefore, of the opinion that a revision of the basis of computing depreciation should be made to the end that the unextinguished balance may be spread over its remaining life. When this is done, there is found a depreciation allowance for the years on appeal less than that already allowed by the Commissioner after making the elimination in question. Since other factors may have entered into such an allowance, we are willing to give the petitioners the benefit of the doubt in this instance and not disturb the deductions as allowed by the Commissioner.

Reviewed by the Board.

*Judgment will be entered for the respondent.*