C. B. SHAFFER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

RAY L. ERB, EARL G. CRAIN AND SAMUEL W. GREGG, EXECUTORS OF THE ESTATE OF E. E. SMATHERS, DECEASED, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 29259, 29260. Promulgated February 28, 1934.

1316

*Charles D. Hamel, Esq., Lee I. Park, Esq., Tracy S. Voorhees, Esq.,* and *James G. Stanley, Esq.,* for the petitioners.
*Chester A. Gwinn, Esq.,* for the respondent.

#### OPINION.

BLACK: These proceedings, which were consolidated for hearing, are for the redetermination of deficiencies in income taxes for the year 1919 of $577,171.41 and $546,600.02 determined by the respondent against C. B. Shaffer and E. E. Smathers, respectively. After filing the original petition in Docket No. 29260, Smathers died and the Board, upon suggestion of death and notice of the appointment of

Ray L. Erb, Earl G. Crain and Samuel W. Gregg as executors, substituted them as petitioners in that proceeding.

The deficiencies arise principally from the redetermination by the respondent of the net income reported for 1919 by a partnership known as C. B. Shaffer No. 2, which was composed of Shaffer and Smathers, as equal partners, and the consequent redetermination of the distributive shares of profits reported by them from such partnership. The questions involved in the two proceedings are identical. Each of the amended petitions assigns 17 errors, lettered (a) to (q), inclusive, most of which relate to and grow out of a sale on May 31, 1919, of the partnership properties to a corporation, the Shaffer Oil & Refining Co. The proceedings were submitted upon several stipulations of fact, testimony of witnesses, and documentary evidence. Effect to the issues stipulated should be given in the recomputations under Rule 50. We will now dispose of the contested issues.

> (a) *Respondent erred in failing and refusing to find that the selling price of the property of the partnership known as C. B. Shaffer No. 2 was not in excess of $7,000,000.*

This issue is automatically disposed of by our decision on the other issues relating to the determination of the sales price and the stipulated facts with respect thereto.

Issues (b), (c), and (d) are disposed of by stipulation, except a portion of issue (c) which petitioners state they will abandon in case issue (f), *infra*, is decided in their favor.

> (e) *Respondent erred in failing and refusing to find that certain oil leases transferred by the partnership to Shaffer Oil & Refining Co. in 1919 had a fair market value as of March 1, 1913, in excess of $4,102,581.63, and in failing and refusing to find that said oil and gas leases had a fair market value as of said date of at least $15,000,000.*

Some time prior to March 1, 1913, C. B. Shaffer and E. E. Smathers became associated in certain oil ventures, in the development, production and sale of oil and its products. Prior to March 1, 1913, they entered into a partnership known as C. B. Shaffer No. 2 (hereinafter sometimes referred to as the partnership) and acquired through such partnership a number of properties (hereinafter sometimes referred to as the partnership properties) located in what later became known as the Cushing Oil Field, Oklahoma. The partnership properties thus acquired and owned prior to and on March 1, 1913 (the valuation of which is here for determination) consisted of leases on an aggregate of 5,183.6 acres of land located in Creek County, Oklahoma, about ten miles east of the town of Cushing. Prior to March 1, 1913, production had been discovered on 1,435 acres of this acreage and on that date oil was being obtained therefrom. The remainder of the acreage, or 3,748.6 acres, was undeveloped on March 1, 1913.

On March 1, 1913, the partnership properties had been developed to a point where there were 37 producing wells which, from February 19 to February 28, 1913, both inclusive, had produced 35,936 barrels or an average of 3,593.6 barrels per day. On that date there was also on the properties one gas well which was producing about 35,000,000 cubic feet of gas per day. These producing wells were located upon the block of 1,435 acres heretofore described as being productive on March 1, 1913. However, on that date wells were being drilled on the partnership leases on undeveloped acreage at distances of from one to two miles from the producing block. While the remaining partnership acreage of 3,748.6 was undeveloped, it was considered by geologists and oil producers as favorably located on the Cushing anticline, a great proportion of which structure was outlined at that time.

On March 1, 1913, a large camp building and office had been erected on the partnership properties. There were 12 fully equipped machine shops. The properties were connected up with gas and water systems. A telephone system had been installed. A large amount of pipe, casing, and other drilling equipment had been assembled. Gathering lines were being placed over the field.

On March 1, 1913, a pipe line was under construction by the partnership from its properties in the field to its tank farm and to a refinery located about eight miles west of the properties near Cushing, and which was in the process of construction by the Consumers Refining Co., substantially all of whose stock was owned by Shaffer and Smathers. The capacity of the refinery was 5,000 barrels a day. At the time the construction of the refinery was started in November 1912 the partnership had entered into a verbal agreement with the Consumers Refining Co. by which that company was to purchase all of its oil requirements from the partnership at the highest market price per barrel and to pay the partnership 20 cents per barrel for piping the oil to it. Afterwards and on June 13, 1913, the agreement was reduced to writing by the parties.

In the summer of 1912 there was erected on the properties a casinghead gas plant for the manufacture of gasoline. This plant belonged to the Consumers Refining Co., with which the partnership had an agreement respecting the manufacturing of the gasoline. In November 1912 the partnership had entered into a contract with one Rowland respecting the marketing of the dry gas from the partnership properties. Late in December 1912 Rowland organized the Creek County Gas Co. and transferred to it his interest in the contract.

With the foregoing equipment and the arrangements for the handling and marketing of the oil and gas produced therefrom the

partnership properties were so organized into a unit that the full value thereof could be realized by the partnership.

On March 1, 1913, the production from the wells on the partnership properties, as well as from all other wells in the Cushing Field, was being taken from the Layton and Wheeler sands and there was no reason why an attempt should then be made to drill into the Bartlesville sand so long as commercial production could be had from these upper sands.

In the area where the partnership properties were located a structural or anticlinal fold existed which was recognized as such prior to March 1, 1913, with definite dips east and west from a north and south alignment from an arch of considerable breadth and of great length. Under such a geological condition the Bartlesville sand in the oil fields and pools to the east and to the north of Cushing up to that time had been found productive. Geologists and practical oil men familiar with this condition prior to March 1, 1913, believed with practical certainty that the Bartlesville sand when drilled into in the Cushing field would be found productive. The fact that production was being had from the Layton and Wheeler sands in the Cushing field on March 1, 1913, led geologists and practical oil men to believe not only that the Bartlesville sand would be present, but that it would be more prolific than in any other of the fields brought in up to that time. This belief was based largely on the fact that in the Cushing field commercial production was being obtained from the Layton and Wheeler sands, while in the older fields, where Bartlesville production existed, commercial production had not been obtained from sands corresponding to the Layton and Wheeler.

On March 1, 1913, Shaffer was fully aware of these geological conditions and believed with a certainty that the Bartlesville sand, considered to be the most prolific and most valuable producing sand in the Midcontinent Field, underlay the partnership properties. His opinion is supported by the opinion of recognized geologists.

On March 1, 1913, it appeared that there was likely to be a shortage of crude oil. Oil men generally recognized the situation and as a consequence oil properties were in greater demand than they had been for years.

Subseqeunt to 1913 wells drilled in the Bartlesville sand on 12 of the partnership leases produced a total of 7,889,991 barrels of oil during the period from 1914 to May 31, 1919.

From 1913 to 1918, inclusive, the partnership received $12,193,- 128.29 from the sale of oil to the Consumers Refining Co. and to outside interests. Receipts for the same period from lineage paid on account of pipe line according to the contract with the Consumers Refining Co. amounted to $2,113,129.53. Receipts from the sale of dry gas during this period amounted to $273,984.50.

On or about April 15, 1920, the partnership duly filed an income tax return for the calendar year 1919, and attached thereto a statement reading as follows:

The assets and good will of the partnership were sold during the taxable year ended December 31, 1919. The profit or loss resulting from such sale cannot be determined until the valuation of the assets and good will of the partnership as of March 1, 1913, is approved by the Bureau of Internal Revenue to whom there has been submitted data in respect to such valuation. When such approved valuations are received an amended return will be submitted.

On or about May 4, 1920, the partnership duly filed an amended income tax return for the calendar year 1919, and reported therein a profit from the sale of its assets of $5,896,322.89. In arriving at such a profit the partnership reported the March 1, 1913, value of its oil properties and leases in question as being $7,091,747.85, itemized as follows:

Nonproducing acreage owned March 1, 1913, producing December 31, 1918_____ $878,459.00
Producing acreage owned March 1, 1913_____ 6,159,288.85
Nonproducing acreage owned March 1, 1913, and December 31, 1918_____ 54,000.00

Total_____ 7,091,747.85

The respondent determined that the acreage in question had a fair market value on March 1, 1913, of $4,102,581.63, and contends that his valuation should be sustained. The petitioners in their brief in effect concede that the value they alleged in their petitions, namely, $15,000,000, was too high, and now contend that the fair market value of the acreage on March 1, 1913, was at least the amount of $10,500,000.

Considerable evidence has been submitted on this issue. Part of the evidence relied upon by petitioners in support of the valuation contended for by them is the opinion testimony of six expert witnesses as to the fair market value of the leases on March 1, 1913. We do not think there would be any profit in discussing the details of this evidence. Suffice it to say petitioners Shaffer and Smathers were oil men of long and varied experience and were thoroughly familiar and conversant with all the conditions with respect to their oil properties owned on March 1, 1913, which we have detailed above. It is reasonable to suppose that they knew more about the value of their property as of March 1, 1913, when they filed their income tax returns for 1919 (in 1920) than these several expert witnesses knew in 1932 when they testified in the hearings held in these proceedings.

We do not think it is reasonable to believe that Shaffer and Smathers undervalued their oil properties as of March 1, 1913, when they filed their income tax returns in 1920 for the year 1919 and reported the profit from the sale. Taxpayers do not usually under-

value their property when fixing a March 1, 1913, value. Giving due weight to all of the evidence, opinion and otherwise, we find that the acreage in question had a fair market value on March 1, 1913, of $7,091,747.85. We make this finding from the evidence and not because we think petitioners would be estopped to claim a higher valuation than that used in the partnership return filed in 1920.

The respondent contends that if we should alter the value of the properties on March 1, 1913, as determined by him, the oil reserves should be redetermined so as to make them commensurate with the redetermined value. In their brief the petitioners agree to this contention of the respondent. The respondent's contention on this point is therefore sustained.

> (f) *Respondent erred in reducing the March 1, 1913, value and subsequent costs of the properties of the partnership so transferred in 1919 by depletion and depreciation sustained prior to December 31, 1915, in excess of 5% of the gross value of the oil produced from said properties during the period from March 1, 1913, to December 31, 1915.*

In determining the profit from the sale of the partnership assets the respondent reduced the March 1, 1913, value and subsequent costs by depletion for the period March 1, 1913, to December 31, 1915, in the amount of $1,270,209.37 and by depreciation alleged to have been sustained on lease equipment for the period in the amount of $349,827.07. The respondent admits that the depletion allowable for the period is limited to $211,630.98, or 5 percent of $4,232,619.74, the gross value at the well of all oil produced by the partnership for the period. He also admits that the remainder of the reduction of $1,270,209.37 made by him on account of depletion, or $1,058,578.39, should be restored to the base in computing the profit on the sale in 1919. However, he denies that any depreciation allowed prior to the date of sale may be restored.

The petitioners contend that the aggregate of the deductions for depletion and for depreciation of lease equipment for the period March 1, 1913, to December 31, 1915, should not exceed 5 percent of the gross value at the well of all the oil produced during the period, relying on the provisions of paragraph B, section II, of the Act of October 3, 1913; *United States* v. *Ludey,* 274 U.S. 295; and our decision in *J. M. Loffland,* 10 B.T.A. 14.

In *J. M. Loffland, supra,* we had before us the identical question here presented. We there held, under the decision in the *Ludey* case, that in computing the gain or loss upon the sale of oil properties in 1920 depreciation and depletion for the years 1913, 1914, and 1915 should be computed under the provisions of paragraph B, section II, of the Act of October 3, 1913, and that the aggregate amount for both depreciation and depletion for those three years was limited to 5 percent of the value of the annual production or output of the oil

at the well for such years. In accordance with our decision in the *Loffland* case, the contention of the petitioners on this point is sustained.

Since this issue is decided in favor of the petitioners, it is not necessary to discuss that portion of issue (c), *supra*, which petitioners state they would abandon if the present issue were decided in their favor.

Issues (g) and (h) will be considered together.

> (g) *In computing the partnership's profit on the sale of said assets, respondent erred in failing and refusing to find that the depreciation sustained on physical equipment prior to the date of sale was not in excess of $1,076,077.68.*

> (h) *In computing the partnership profit on the sale of said assets, respondent erred in reducing the March 1, 1913, value and subsequent costs of physical equipment by the amount of $1,567,048.50, or any other amount in excess of $672,407.32, on account of depreciation allowable prior to the date of sale.*

In determining the profit from the sale of the partnership assets, the respondent reduced the basis of the property sold by " Depreciation sustained to January 1, 1919," in the amount of $1,567,048.50. Petitioners contend that the depreciation actually *sustained* to May 31, 1919, was no more than $1,076,077.68.

The amount of $672,407.32 referred to in assignment of error (h), *supra*, as depreciation *allowable* " prior to the date of sale " is the total of the alleged depreciation sustained for the years 1916, 1917, and 1918 of $186,911.85, $227,205.07, and $258,290.40, respectively, and contains no part of the alleged depreciation sustained prior to the year 1916 or for the period January 1 to May 31, 1919. As will later appear, however, this is not important. We mention it merely to account for the above amount of $672,407.32.

The depreciation originally claimed by the partnership, the depreciation allowed by the respondent, and the amount now claimed by petitioners to have been sustained from 1912 to and including May 31, 1919, by years, is summarized as follows:

| Year | Depreciation originally claimed by partnership | Depreciation allowed by respondent | Depreciation now claimed to have been sustained |
|------|------|------|------|
| 1912 | $38,769.55 | $38,769.55 | $10,501.27 |
| 1913 | 162,591.89 | 162,591.89 | 51,250.64 |
| 1914 | 219,830.30 | 108,803.14 | 94,456.06 |
| 1915 | 335,129.77 | 159,893.25 | 133,038.88 |
| 1916 | 447,328.18 | 288,551.33 | 186,911.85 |
| 1917 | 449,752.83 | 364,269.34 | 227,205.07 |
| 1918 | 445,444.46 | 444,170.00 | 258,290.40 |
| 1919 to May 31 | None | None | 115,494.77 |
| 1914 adjustment | | | (1,071.26) |
| Total | 2,098,846.98 | 1,567,048.50 | 1,076,077.68 |

Of the above amount of $1,567,048.50 allowed by the respondent, $1,392,824.63 was on lease equipment and the balance, or $174,223.87, was on other assets, consisting of horses, wagons, automobiles, furniture, fixtures, telephone lines, pipe lines, pump stations, and a ferryboat. In their brief the petitioners accept the amounts allowed by the respondent on all of the physical equipment except the lease equipment. They contend in their brief that depreciation sustained on lease equipment prior to the date of sale did not exceed $894,439.19.

The parties have stipulated the depreciation claimed, allowed, and now claimed by petitioners to have been sustained on "lease equipment" down to the date of sale, May 31, 1919. Said stipulation is incorporated herein by reference.

The difference of $1,071.26 between the total of $895,510.45 shown in the stipulation and the amount of $894,439.19 contended for in the brief of the petitioners as depreciation actually sustained on lease equipment, represents an adjustment made in accrued depreciation on assets sold in 1914.

From the table in the stipulation filed, it is apparent that the partnership consistently from 1912 to December 31, 1918, charged off depreciation on its books on lease equipment at the rate of 20 percent annually and claimed deductions therefor in its returns at that rate. For three of the years the respondent allowed depreciation at the rate claimed by the partnership; for two years he allowed only half the rate claimed; and for two other years he allowed approximately three fourths of the rate claimed. Although the partnership uniformly wrote off and claimed depreciation at the rate of 20 percent from 1912 through 1918, the petitioners now contend that depreciation at the rate of only 10 percent was sustained and that that rate should be used in determining the profit from the sale. The respondent, while conceding that depreciation for the period from January 1 to May 31, 1919, is allowable (the amount of which is to be considered hereafter), contends that no adjustment should be made in the amount allowed by him down to December 31, 1918, and used by him in determining the profit from the sale.

In support of their contention the petitioners introduced testimony and certain stipulated facts for the purpose of showing that the depreciation deductions allowed by the respondent in determining income for years prior to the sale are excessive. The respondent in certain of those years allowed the deductions claimed by the partnership and in other years allowed lesser amounts than those claimed.

Whatever the useful life of the lease equipment was, whether 5 years as used by the partnership in its returns, or 10 years as indi-

cated by testimony, or some other period as might be indicated by the stipulation, we think a determination of the question is not to be based upon this consideration alone. The taxpayers have had the benefit of the deductions allowed by the respondent in determining taxable income for prior years. If such amount is now to be reduced, they will have the benefit of a double deduction to the extent of the reduction. In the prior years the partnership claimed greater deductions for some years than were allowed and claimed at least as much as was allowed in each year. We think that this question is governed in principle by our decision in the case of *Alpin J. Cameron*, 8 B.T.A. 120; affd., 56 Fed. (2d) 1021. In affirming our decision, the Circuit Court of Appeals said:

The evidence establishes that these eliminated items were not only in use in 1921, but were also giving satisfactory service in 1926. But " the amount of the allowance for depreciation is the sum which should be set aside for the taxable year, in order that, at the end of the useful life of the plant in the business, the aggregate of the sums set aside will (with the salvage value) suffice to provide an amount equal to the original cost." *United States* v. *Ludey*, 274 U.S. 295, 300, 47 S.Ct. 608, 610, 71 L.Ed. 1054. Obviously, the taxpayers are not entitled to a double deduction for the same capital assets, and, if the fact is, as the Board found, that the assets have been fully depreciated, the taxpayers can no longer rightfully claim an allowance for depreciation even though such assets continue to give useful services.

While in this case there is no question as to the assets having been fully depreciated, the fundamental principle is the same. In that case the claim was made that depreciation deductions in prior years were in error and that too much had been allowed as shown by the continued use of the assets. In our opinion a double deduction is no more warranted in this case than in the *Cameron* case. This contention is therefore denied, except to the extent that it is affected by our ruling under issue (b).

No depreciation was claimed by or allowed to the partnership for the period January 1 to May 31, 1919. The respondent admits that the partnership is entitled to depreciation for the period. In his brief, which was in reply to the brief of the petitioners, the respondent takes no exception to allowance of depreciation at the rates which the petitioners state in their brief they are willing to accept. Accordingly, we hold that for the period from January 1 to May 31, 1919, the partnership is entitled to depreciation deductions at the rate of 10 percent on lease equipment; at the rate of 18 percent on horses and wagons; at the rate of 12 percent on furniture and fixtures; at the rate of 7 percent on pipe lines; at the rate of 10 percent on pump stations; and at the rate of 10 percent on telephone lines. The amount of depreciation thus determined for the period January 1 to May 31, 1919, should also be deducted from the basis

in determining the profit from the sale in the recomputations to be made under Rule 50.

(i) *In computing the profit on said sale, respondent erred in eliminating from costs subsequent to March 1, 1913, the sum of $716,987.03, representing capital expenditures incurred for drilling subsequent to December 31, 1915.*

In determining the cost of the partnership properties the respondent included therein a total of $704,959.26, representing expenditures made by the partnership from March 1, 1913, to December 31, 1915, for labor, fuel, repairs, etc., in connection with the exploration of the properties, drilling wells, etc., which had been capitalized by the partnership on its books. The respondent, however, did not include in the cost of the properties an amount of $669,910.48, representing expenditures made by the partnership from January 1, 1916, to December 31, 1918, for labor, fuel, repairs, etc., in connection with the exploration of the properties, drilling wells, etc., which were not capitalized by the partnership, but were deducted by it as operating expenses under the option contained in T.D. 2447 and art. 223 of Regulations 45. These expenditures were allowed by the respondent as deductions to the partnership in the determination of the tax liability of Shaffer and Smathers for the years 1916, 1917, and 1918.

Although the expenditures made between January 1, 1916, and December 31, 1918, were deducted by the partnership and allowed by the respondent as operating expenses, the petitioners now claim that they should be treated as capital expenditures and used to reduce the profit from the sale of the properties in 1919. The respondent contends that, the partnership having elected under the option given it under art. 223 of Regulations 45 to deduct such expenditures as operating expenses, the petitioners may not now have the expenditures treated as capital expenditures. The petitioners contend that the partnership originally elected to treat such expenditures as capital expenditures, as is shown by its capitalizing those made from March 1, 1913, to December 31, 1915, and that, having made that election for 1913, 1914, 1915, it was bound by it for all subsequent years under article 223 of Regulations 45.

T.D. 2447, promulgated February 8, 1917, under the Act of September 8, 1916, provided in part as follows:

The incidental expenses of drilling wells, that is, such expenses as are paid for wages, fuel, repairs, etc., which do not necessarily enter into and form a part of the capital invested or property account, may, at the option of the individual or corporation owning and operating the property, be charged to property account subject to depreciation or be deducted from gross income as an operating expense.

Art. 223 of Regulations 45, issued under the Revenue Act of 1918, contains substantially the same provision as the foregoing, except

that in addition thereto there is the provision that "An election once made under this option will control the taxpayer's returns for all subsequent years."

The validity of the above quoted provision of T.D. 2447 and the corresponding provision of art. 223 of Regulations 45, with the added provision quoted above, is no longer open to question. *C. E. Wentz, Trustee*, 26 B.T.A. 868; *W. R. Ramsey*, 26 B.T.A. 277; affd., *Ramsey* v. *Commissioner*, 66 Fed. (2d) 316; certiorari denied, 290 U.S. 673.

A careful reading of T.D. 2447 fails to disclose that, where prior to 1916 a taxpayer had capitalized the expenditures described therein, he was required to continue to do so under that decision. That decision clearly indicates the contrary by expressly providing that at the option of the taxpayer such expenditures might be charged to property account or be deducted from gross income as an operating expense. Furthermore, there is nothing in the decision which expressly limits him with respect to the method of handling similar expenditures in future years. Under T.D. 2447 and article 223 of Regulations 45, the partnership was free, in its returns under the Act of 1916, and as amended by the Act of 1917, and under the Act of 1918, respectively, to have continued its method of capitalizing the class of expenditures here in controversy, but it saw fit to do otherwise. Having been permitted to do so and having done so, no change may now be made with respect to the option thus exercised by it. *C. E. Wentz, Trustee, supra; Ramsey* v. *Commissioner, supra.*

The stipulated facts show that from January 1 to May 31, 1919, the partnership expended $47,076.55 for the same purposes as that for which the expenditures we have just been considering were made. It is not clear from the record to what extent, if any, this amount was allowed as a deduction in computing the earnings from the operations of the partnership. Since we have held the partnership bound for the years 1916 through 1918 by the option exercised by it, and in view of the restriction as to a change contained in art. 223 of Regulations 45, the amount of $47,076.55 may not now be treated as a capital item. To the extent that the amount has not been considered by the parties as an operating expense in computing the income from operations for the period, it should be treated as such in a recomputation of the tax liability of the petitioners.

Issue (j) is the same as issue (i), *supra*, except that it is restated in a different manner.

Issues (k), (l), and (m) will be considered together, as they all involve the question whether the respondent erred in including in the selling price of the assets and in the income of the partnership

the amount of $1,910,442.02 representing Federal income taxes for 1919 of Shaffer and Smathers, arising from such sale and paid by the Shaffer Oil & Refining Co. in 1920, pursuant to the purchase agreement.

In 1919 Shaffer and Smathers not only owned the assets of C. B. Shaffer No. 2, but also substantially all of the stock of the Theta Oil Co. and the Consumers Refining Co. On May 20, 1919, C. B. Shaffer and H. M. Byllesby & Co. entered into a contract of sale of the assets of the partnership, C. B. Shaffer No. 2, together with the assets of the Theta Oil Co. and the Consumers Refining Co. to a company to be formed.

Under the terms of the contract, Shaffer was to cause a corporation to be formed having 500,000 authorized shares of common stock without par value and 500,000 authorized shares of preferred stock of the par value of $100 each. Under the contract there were to be conveyed to the company to be formed the oil and gas leases here in controversy, together with certain physical property used and held in the business of the partnership in the development and production of oil and gas. In consideration for the transfer of the foregoing assets, the partnership was to be paid therefor as follows: Cash, $7,000,000; notes, $1,000,000; and 44,000 shares of the preferred stock and 80,000 shares of the common stock in the company to be formed. In addition to the foregoing consideration for the transfer, the contract contained the following provision respecting the payment of taxes of the partners arising from the transaction:

The Company to be formed shall pay to the owners in C. B. Shaffer No. 2, all United States Internal Revenue Tax whatsoever that may be assessed by the Government for the calendar year 1919 arising from the profits of the sale of the C. B. Shaffer No. 2 property to the Company to be formed, and in addition, such increase of the surtax as provided in Article 13 of Regulations 45 promulgated by the Internal Revenue Department, which said owners on C. B. Shaffer No. 2 property may be assessed on an amount not to exceed Two Hundred Thousand Dollars ($200,000) for each of said owners for other income than that derived from the profits of the sale of C. B. Shaffer No. 2 property because of such sale and profits derived therefrom. It being the intention that there shall be paid by the Company in addition to the tax upon the profits derived from such sale, only the difference between the sur-tax that would be payable by the owners on an amount of income not to exceed Two Hundred Thousand Dollars ($200,000) each, if no sale had been made or profits derived, and the increased sur-tax on said Two Hundred Thousand Dollars ($200,000) for each of said owners resulting because of profits derived by such owners from such sale. To provide for payment of such taxes, there shall be reserved and set aside by the Company to be formed and held within its Treasury, the sum of Three Million Dollars ($3,000,000), the same and no part of which shall be used for any other purpose until such taxes have been fully paid.

Pursuant to the provisions of the contract the Shaffer Oil & Refining Co. was organized as a corporation on May 31, 1919, and on the

same day the sale was consummated substantially in accordance with the terms of the contract.

As stated under issue (e), *supra*, the partnership in its amended return for the year 1919 reported a profit of $5,896,322.89. It arrived at that amount as follows:

| | |
|---|---:|
| Cash and notes | $8,000,000.00 |
| 44,000 shares preferred stock | 4,400,000.00 |
| 80,000 shares of common stock | 80,000.00 |
| Tax of partners to be paid by vendee | 1,910,442.02 |
| | 14,390,442.02 |

| | | |
|---|---:|---:|
| Less: March 1, 1913, value and subsequent cost of property | $10,382,971.34 | |
| Deduct depreciation and depletion | 1,888,852.21 | |
| | | 5,896,322.89 |

On May 5, 1920, Shaffer filed an amended return for 1919 in which he reported $3,153,988.63 as income received from the partnership. On June 15, 1920, Smathers filed an amended return for 1919 in which he reported $3,153,988.62 as income received from the partnership. In determining the deficiencies against petitioners the respondent determined a profit of $7,917,268.14 from the sale of the assets of the partnership to the Shaffer Oil & Refining Co., computed as follows:

| | | |
|---|---:|---|
| Selling price: | | |
| Cash | $7,000,000.00 | |
| Notes | 1,000,000.00 | |
| 44,000 shares of preferred stock | 2,051,280.00 | —$46.62 per share |
| 80,000 shares of common stock | None | |
| Tax on sale C. B. Shaffer No. 2 (paid) | 1,910,442.02 | |
| Depletion sustained to Jan. 1, 1919 | 2,312,652.86 | |
| Depreciation sustained to Jan. 1, 1919 | 1,567,048.50 | |
| Total selling price | | $15,841,423.38 |
| Cost: | | |
| March 1, 1913, value (Depletable) | $4,102,581.63 | |
| March 1, 1913, value of equipment | 397,418.27 | |
| Capital additions and subsequent costs | 952,586.76 | |
| Equipment added subsequent to March 1, 1913 | 2,477,888.58 | |
| | | $7,924,155.24 |
| | | 7,917,268.14 |

In May 1920 the Shaffer Oil & Refining Co. paid to Shaffer and Smathers pursuant to the provisions of the contract of sale the amount of $1,910,442.02, which represented the aggregate amount of tax paid by them for which they were in 1920 reimbursed under the terms of the sales agreement. The respondent was advised by the

individual partners prior to the issuance of the deficiency letters for 1919, and also prior to the issuance of certain deficiency letters covering the years 1920 and 1921, that they had erred in reporting the $1,910,442.02 as income to the partnership and to themselves as partners in the year 1919 and they insisted that such amount be held to be income to them as individuals in 1920 and not in 1919. Neither Shaffer nor Smathers included in his original return for 1920 any part of the amount of $1,910,442.02 as income in such year, nor did either file an amended return for 1920 showing any part of such amount as income for such year.

Shaffer and Smathers each had extensive investments other than the investments in the property sold to the Shaffer Refining Co. They had large investments in other oil leases and in June 1919 a suit was pending against Shaffer in respect to a certain Fred Tucker lease, upon which a judgment was later rendered against him for $750,000. Smathers was an extensive trader on the New York Stock Exchange and during 1919 sustained a loss of $204,084 as a result of such operations. During that year his purchases and sales of stocks amounted to $10,961,847.50 and $10,747,627.08, respectively.

Shaffer and Smathers kept their books of account and filed their income tax returns on a cash receipts and disbursements basis.

Petitioners contend that the partnership also kept its books and filed its returns on the cash receipts and disbursements basis; and that the obligation of the purchasing company to pay petitioners' taxes on the sale had no fair market value on or about May 31, 1919, the date of the sale, and was not income to petitioners until 1920. The respondent contends that the position petitioners took in their amended returns for 1919 was proper, and that they are now estopped to change their position to the detriment and loss of the Government.

We do not believe, as will immediately appear, that it is material in deciding the present issue whether the partnership's books were kept on the cash receipts and disbursements basis or on the accrual basis. The result would be the same in either case. The test for determining profit to be applied is found in section 202 (b) of the Revenue Act of 1918, which reads in part as follows:

When property is exchanged for other property, the property received in exchange shall for the purpose of determining gain or loss be treated as the equivalent of cash to the amount of its fair market value, if any; * * *

The sale in the instant case occurred on May 31, 1919. Of course it is plain that all the cash received was to be accounted for in 1919 as well as the notes for $1,000,000, admittedly worth their face value, and also the 44,000 shares of preferred stock to the extent of their admitted fair market value. Another part of the consideration received was the vendee's promise to " pay to the owners in C. B.

Shaffer No. 2, all United States Internal Revenue Tax whatsoever that may be assessed by the Government for the calendar year 1919 arising from the profits of the sale of the C. B. Shaffer No. 2 property to the Company to be formed, and in addition such increase of the surtax * * *." In applying section 202 (b), *supra*, two questions present themselves: (1) As of what date is the obligation of the purchaser to pay the taxes of the partnership owners to be valued? (2) having decided upon the date, did the obligation have a fair market value as of that date?

Regarding the first question, we think it is axiomatic that the date to use is the date of the sale itself. The only reason for entertaining the question at all is that it is at once apparent that on May 31, 1919, the date of the sale, it was absolutely impossible to determine whether the partnership owners would be liable for any taxes whatever for the calendar year 1919, whereas, on December 31, 1919, the close of the taxable year, it was possible to ascertain that fact, and also the amount of the tax, if any. But for the purpose of determining gain or loss under section 202 (b), *supra*, we believe Congress intended that the property received in exchange should be treated as the equivalent of cash to the amount of its fair market value on the date received and not at some other date during the current taxable year. For instance, suppose a taxpayer, reporting on the calendar year basis, exchanged during February property which had cost $1,000 for other property having a fair market value on the date of exchange of $1,200. We say the taxpayer realized a gain of $200. But suppose on the following December 31 the property received in exchange only had a fair market value of $900. Would we say that in reporting for the full taxable year the taxpayer would report a loss of $100 instead of a gain of $200? We think not.

Regarding the second question, we are of the opinion that the obligation to pay petitioners' taxes by the purchaser falls within the ambit of the language used by the Supreme Court in *Burnet* v. *Logan*, 283 U.S. 404, wherein the Court said:

The liability for income tax ultimately can be fairly determined without resort to mere estimates, assumptions, and speculation. When the profit, if any, is actually realized, the taxpayer will be required to respond. The consideration for the sale was $2,200,000 in cash and the promise of future money payments wholly contingent upon facts and circumstances not possible to foretell with anything like fair certainty. The promise was in no proper sense equivalent to cash. It had no ascertainable fair market value. The transaction was not a closed one.

At the time of the receipt of the promise to pay the taxes in May 1919 it could not be determined whether any amount would ever be paid. The taxes to be paid were those on the income of the

partners, including certain surtaxes for the calendar year 1919. They were extensively engaged in many enterprises, certain transactions giving rise to gains and others to losses. On the one hand, the net result of such operations might be losses, resulting therefore in no tax liability for the year, while again such operations might have resulted in such large profits as to produce a much greater tax than the amount finally paid by the vendee. In view of the highly speculative and contingent nature of the right acquired from the vendee, we do not think it can be said to have had a fair market value at the time of its receipt. *Burnet* v. *Logan, supra.* The contention of the petitioners is accordingly sustained. The taxes paid in 1920 would under the circumstances above related be an income item to petitioners in 1920. Cf. *Charles Bispham Levey*, 26 B.T.A. 889, affd., 68 Fed. (2d) 401; *Old Colony Trust Co.* v. *Commissioner*, 279 U.S. 716.

We fail to see any grounds for estoppel. The respondent was notified, prior to the time that the statute of limitation had run as to the year 1920, that petitioners were contending that they erred when they reported the $1,910,442.02 in question as income for 1919 and that they should have reported it as income for 1920. The respondent's contentions on this point are denied.

Issue (n) was waived by petitioners.

(o) *Respondent made a mathematical error in his computation of profit to the partnership, C. B. Shaffer No. 2, on said sale of the assets in 1919.*

Any mere mathematical errors in the computation of the tax may be corrected in the settlement under Rule 50.

Issue (p) was waived in a separate stipulation. Issue (q), which was the last assignment of error, was also disposed of by stipulation.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

GOODRICH dissents.

———

STERNHAGEN, MURDOCK, and ADAMS: As to the vendee's obligation to pay the resulting taxes (issues k, l, and m), while we agree with the result because petitioners' partnership was on the cash basis, we disagree with the reasons given for the decision.

———

TRAMMELL, dissenting: I cannot agree on the question of valuation of the property as of March 1, 1913. In my opinion, the evidence clearly shows that the value shown on the return was erroneous and that the true value was at least $9,000,000. My opinion is based on having heard the testimony.