THE BALTIMORE AND OHIO RAILROAD COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 37239. Promulgated March 28, 1934.

*R. Kemp Slaughter, Esq.,* and *Hugh C. Bickford, Esq.,* for the petitioner.

*Orris Bennett, Esq.,* for the respondent.

### OPINION.

SEAWELL: The respondent determined deficiencies in income taxes for 1920 and 1923 in the respective amounts of $884,450.47 and $984,818.05. Some of the issues raised were abandoned or disposed

of by stipulation. This action of the parties will be reflected in the recomputations to be made under Rule 50. The issues remaining for decision, together with the applicable facts, will be stated and decided in the order in which they appear in the petitioner's brief. The proceeding was submitted upon a stipulation of facts, testimony of witnesses, and documentary evidence. Only so much of the stipulated facts will be stated as is necessary for a clear understanding of the question presented.

The petitioner is a Maryland corporation and in each of the years 1920 to 1923, inclusive, was the parent of certain subsidiaries with which it was consolidated for tax purposes and on behalf of which it is liable for all taxes. The petitioner and certain of its subsidiaries were at all times hereinafter referred to engaged in the business of owning and operating a railroad and transportation system, railroad terminal facilities, and other related facilities. The petitioner and its affiliated corporations which are engaged in such transportation business are subject to the act of Congress known as an Act to Regulate Commerce and acts amendatory thereof and supplementary thereto. Their books of account are kept on the accrual basis of accounting in accordance with the system of accounting prescribed by the Interstate Commerce Commission. The affiliated corporations not engaged in transportation also kept their books on an accrual basis.

## II.

The issue is whether it was error to include in taxable income for 1920 and 1923 the respective amounts of $215,265.26 and $335,883.05, representing contributions received by petitioner and its subsidiaries toward the construction of sidings, spur tracks, and other railroad properties.

On November 2, 1916, the Baltimore & Ohio Chicago Terminal Railway Co., one of petitioner's affiliates, hereinafter referred to as the Baltimore Co., and other railroad companies entered into a written agreement with the Sanitary District of Chicago, hereinafter referred to as the District, in which the Baltimore Co. agreed to relocate certain main line and spur tracks and perform other work on its Chicago Central Division on account of interference of the tracks with a right of way established by the District for a channel, known as the Calument-Sag Channel. The contract provided for rights of way and contained among other things, agreements of the parties as to (1) the place of location of the new tracks; (2) the construction of a new bridge by the Baltimore Co. over Stony Creek; (3) the manner of ascertaining the cost of work to be performed and material to be furnished by the Baltimore Co. and when such cost would be repaid by the District; and (4) the construction by the Baltimore Co. of a new interlocking plant. The contract specifically provided

for the payment of $10,000 by the District to the Baltimore Co. as the District's proportionate share of the cost of the bridge over Stony Creek, and $22,300 for the cost of constructing the interlocking plant.

Section 29 (h) of the contract provided as follows:

The capitalized increased cost to said Baltimore Company and its lessees, of operating its and their trains and maintaining its tracks due to the increase in length of and increase in curvature in the tracks of said Baltimore Company resulting from relocating of said tracks hereunder, shall be estimated at nineteen thousand, seven hundred and seventy-three dollars and fifty cents ($19,773.50).

In 1920 and 1923 the District paid to the Baltimore Co. pursuant to the contract of November 2, 1916, the respective amounts of $52,338.23 and $1,710.37. The Baltimore Co. credited these amounts to " Profit and Loss, Account 606, Donations," in the year of receipt by the following journal entries:

|  | 1920 | 1923 |
|---|---|---|
| Bridge over Stony Creek | $10,000.00 | |
| Interlocking Plant, Blue Island | 22,230.00 | |
| Moving buildings | 334.73 | |
| Capitalized increased cost of operation | 19,773.50 | |
| For amount of sundry bills rendered during August 1923 | | $1,710.37 |

The petitioner entered into two classes of contracts by the terms of which shippers desiring the facilities deposited with the petitioner cash sums to pay the cost of constructing spur tracks and sidetracks. In one class of contracts the sums deposited were to be refunded, over a period of two years unless sooner refunded, at the rate of $2 " per car on all in and outbound carload shipments hauled on said tracks for the Second Party [contributor] during the next three (3) months next preceding upon which the railroad received a net revenue of Fifteen Dollars ($15.00) or more per car." The other class of contracts contained a similar provision for refunding the amount deposited, but the time for making the refunds was not limited. The unrefunded balances of cash deposited under the first class of contracts in the years in which they expired were as follows:

| Prior to 1920 | 1920 | 1921 | 1922 | 1923 |
|---|---|---|---|---|
| $1,075.02 | $25,683.18 | $34,904.27 | $63,888.58 | $37,159.03 |

The unrefunded balance at the close of 1923 under the contracts having no time limit for refunds, ten in number, was $39,454.89.

In 1923 the petitioner transferred the foregoing balances, totaling $202,164.97, to an account in its books entitled " Profit and Loss, #606—Donations."

The respondent, in the stipulation, concedes error in including in income for 1920 and 1923 the sums of $162,927.03 and $130,422.37,

respectively. In his brief he concedes further error in including in gross income for 1920 the amounts of $10,000 and $22,230, a total of $32,230, received from the District under the agreement of November 2, 1916, and increasing 1923 income by $125,551.05, representing unrefunded balances of deposits made under contracts for the construction of sidetracks, having time limits for refunds expiring prior to 1923. Of the amount of $125,551.05, $25,683.18 represents unrefunded balances of contracts expiring in 1920. By an amendment to his answer, the respondent alleges that this sum should be included in gross income for 1920, and asks for an increased deficiency for that year. Thus, the amounts left in issue, after giving effect to the foregoing concessions and allegations of the respondent, are divisible into four classes:

1. Amounts received from the District by the Baltimore Co., $20,108.23 in 1920 and $1,710.37 in 1923;

2. Amounts aggregating $25,683.18 and $37,159.03 credited to profit and loss account in 1923, representing unrefunded balances of cash deposits made under contracts for the construction of industrial spur tracks having stipulated time limits for refunds which expired in 1920 and 1923, respectively;

3. Amounts aggregating $39,454.89 credited to profit and loss account in 1923, representing unrefunded balances of cash deposits under contracts for the construction of industrial spur tracks, such contracts having no time limits for refunds; and

4. An amount of $1,585.34, being a part of the total amount involved for 1923, in respect of which evidence is entirely lacking.

The amounts of $334.73 and $19,773.50, a total of $20,108.23, and $1,710.37, involved in the first classification, were received by the Baltimore Co. from the District pursuant to the contract of November 2, 1916. The item amounting to $334.73 was entered on the books of the Baltimore Co. as having been received for "Moving buildings," and the item of $1,710.37 was recorded on the books as a payment "For amount of sundry bills rendered during August, 1923." As to the amounts of $334.73 and $1,710.37, the petitioner contends that they constitute capital contributions. The position of the respondent is that he should be sustained for lack of proof of error.

The book entries and the contract constitute the only evidence before us on the question. This is not enough to prove error. It may be that the amounts were paid for services rendered. On this issue the respondent is sustained.

The contract under which the remaining item of $19,773.50 was paid contemplates the construction of capital assets at the expense of the District and the respondent has conceded that some of the amounts paid by the District pursuant to its provisions were capital

contributions. As to this item he says that "In substance the payment was to reimburse the petitioner for increased operating expenses to be incurred in the future." The case of *Burnet* v. *Sanford & Brooks Co.*, 282 U.S. 359, is cited by him as requiring a decision in his favor. The petitioner claims that the amount is a capital contribution and, as such, not taxable income.

In the case cited, the respondent in 1920 recovered a sum for breach of warranty of the character of the material to be dredged. In holding the amount to be taxable in 1920, the Court said:

That the recovery made by respondent in 1920 was gross income for that year within the meaning of these sections cannot, we think, be doubted. The money received was derived from a contract entered into in the course of respondent's business operations for profit. While it equalled, and in a loose sense was a return of, expenditures made in performing the contract, still, as the Board of Tax Appeals found, the expenditures were made in defraying the expenses incurred in the prosecution of the work under the contract, for the purpose of earning profits. They were not capital investments, the cost of which, if converted, must first be restored from the proceeds before there is a capital gain taxable as income. See *Doyle* v. *Mitchell Brothers Co.*, supra, page 185 of 247 U.S., 38 S. Ct. 467.

We have the converse of that case here. Instead of deferring settlement until after the additional expenses were paid, the parties agreed upon a capitalized amount, payable at once. No part of the amount was used or intended to be used in the construction of a capital asset. The cost of the new track, on account of which the sum was paid, was paid for by the District under other provisions of the contract. On this question the respondent is sustained.

The contracts giving rise to the items of $25,683.18 and $37,159.03, referred to in the second classification, provided for the payment by the applicant to the railroad of the cost of constructing sidetracks, the cost to be refunded to the applicant as set forth above. The petitioner acquired ownership of the assets upon their completion, and the shipper was under no obligation to make shipments of freight over the lines of the railroad company.

We had the same question in *Union Pacific R.R. Co.*, 26 B.T.A. 1126, 1128; reversed, 69 Fed. (2d) 67, on another issue. On the basis of facts in all essential respects the same as those involved here, we concluded, following *Great Northern Ry. Co.*, 8 B.T.A. 225, that the unrefunded amounts on hand upon the expiration of the time within which refunds were to be made to the applicant did not constitute income to the railroad company. Following that case and *Southern Ry. Co.*, 27 B.T.A. 673, the issue is decided in favor of the petitioner.

The facts respecting the amounts aggregating $39,454.89 in the third class of items are in all essential respects the same as the classification just disposed of, with the exception that the contract-

ing parties set no time limit for refunding the deposits. This distinction does not call for a different answer. The taxable status of the advances is to be determined by the purpose for which they were made. Had no refunding arrangement been agreed to the amounts would not have been taxable to the recipient in the respective years in which they were made, following *Liberty Light & Power Co.*, 4 B.T.A. 155, and other cases cited on a similar question in *Southern Ry. Co.*, *supra.* The possibility of refund in cases of this sort affects only the amount of the capital contribution and does not alter the character of the advances. Except for the amount in the hands of the railroad company subject to refund, the status of the advances in relation to their taxability was the same in 1923 as the years in which the amounts were received. On this issue the respondent is reversed.

As to the remaining amount of $1,585.34, the respondent is sustained, due to lack of proof of error.

## III.

The disallowance in 1920 and 1923 as deductions of the respective amounts of $36,080.26 and $34,585.20, representing expenses paid or incurred in those years in connection with the issuance of certain securities, is alleged by the petitioner to be error.

The parties have stipulated as follows:

In July 1919 petitioner offered and issued its " Ten-Year 6% Gold Bonds " in the aggregate amount of $35,000,000, dated July 1, 1919 and due July 1, 1929. At the time of the original offer of such bonds the final certificates for the definitive bonds were not completed and, as a result, it was necessary to issue temporary certificates to the purchasers thereof. Such temporary certificates were cancelled and exchanged for the final definitive bonds on December 16, 1919. In 1920 the petitioner received bills for services in connection with the issuance of such temporary certificates and in connection with such final definitive bonds and paid the same as follows:

| | |
|---|---:|
| To American Bank Note Company for printing definitive and registered bonds | $19,250.00 |
| To United States Mortgage and Trust Co. for Services in connection with and certification of temporary bonds, 35,000 temporary certificates at 10¢ | 3,500.00 |
| To U. S. Mortgage and Trust Co. for services in acceptance of trust and certification of definitive bonds, 35,000 definitive certificates at 40¢ | 14,000.00 |
| To Francis Emory Fitch for listing application on New York Stock Exchange, paid March 23, 1920 | 137.50 |
| To Crevath Henderson, Leffingwell and DeGorsdorff: | |
|     For Professional services \_\_\_\_\_ $2,000.00 | |
|     Reimbursement for printing trust indenture \_\_\_\_\_ 1,212.00 | |
|     Reimbursement for listing application \_\_\_\_\_ 225.50 | |
|     Total paid December 12, 1920 | 3,437.50 |
| TOTAL | $40,325.00 |

\*   \*   \*   \*   \*   \*   \*

The petitioner entered the entire amount thereof on its books as an expense at the time of payment, and claimed as a deduction from gross income in its income tax return for 1920 the total amount of such expenditures both for the temporary certificates and the definitive bonds in the amount of $40,325. Of such amount the Commissioner of Internal Revenue has allowed $4,244.74 as a deduction in the year 1920, being an aliquot proportion of the total amount thereof as compared with the total life of the final bonds, and has disallowed as a deduction in said year the remaining portion amounting to $36,080.26.

The Commissioner has also allowed as a deduction from gross income in the years 1921, 1922 and 1923 a similar proportion of such expenditures in the amount of $4,244.74.

On August 1, 1922 the petitioner issued $6,750,000 of its "5% Equipment Gold Trust Certificates", dated August 1, 1922, due $450,000 annually on August 1 of each year until 1937. In connection with such issue there were issued temporary certificates, due to the fact that the final bond certificates were not ready at the time of issuance. In January and February 1923 there was billed against The Baltimore and Ohio Railroad Company and paid by it the following amounts in connection with the issuance of such equipment trust certificates:

| | |
|---|---:|
| To American Bank Note Company for printing definitive bonds | $2,517.50 |
| To Gerard Trust Company for services as Trustee | 6,412.50 |
| To Phila. News Bureau for advertising issuance of equipment trust | 101.76 |
| To Signature Company of New York for services in signing the bonds | 67.50 |
| To Gerard Trust Company for services in cremating temporary certificates issued prior to the issuance of definitive bonds | 26.68 |
| Total | 9,125.94 |

The petitioner entered the entire amount thereof $9,125.94 as an expense upon its books in the year 1923 and included such amount in its deductions from gross income as reflected in its income tax return for said year. The Commissioner of Internal Revenue has disallowed $8,264.20 thereof as a deduction from gross income in 1923 and has allowed the balance of $861.74 representing an aliquot proportion compared with the remaining life of said equipment trust.

On February 1, 1923 the petitioner issued $13,875,000 of its "Equipment trust 5% Gold Certificates of 1923" dated February 1, 1923, and due, in the amount of $925,000 annually, on February 1 of each year until 1938. In the year 1923 there was billed against petitioner and paid by it the following amounts in connection therewith:

| | |
|---|---:|
| To Gerard Trust Company: for services as Trustee | $11,793.75 |
| For reimbursement of recording fee | 44.50 |
| For telephone calls | 22.85 |
| For notary fees | 83.25 |
| To U. S. Government for Internal Revenue Stamp taxes | 6,955.50 |
| To American Bank Note Company for printing definitive bonds | 4,801.25 |
| To Signature Company of New York for services in signing bonds | 138.75 |
| Total | $23,839.85 |

The petitioner entered the total amount thereof, $23,839.85, upon its books as an expense during the said year 1923 and included such amount in its deductions from gross income as reflected upon its tax return for the said year 1923. The Commissioner of Internal Revenue has disallowed as a deduction

from gross income the amount of $22,383.00 thereof and has allowed $1,456.85, as an aliquot proportion thereof based on the life of such Equipment Trust.

On December 1, 1923, petitioner issued $7,000,000 of its "Equipment Trust 5% Series A Bonds" to be dated December 1, 1923, and due $500,000 annually on December 1, of each year until 1938. At the time of such issuance the final definitive bond certificates were not ready for distribution and it was necessary to have printed and issue temporary certificates, which temporary certificates were substantially exchanged for final certificates and cancelled. In December 1923 petitioner paid to the American Bank Note Company the amount of $460.00 for printing 7,000 of such temporary certificates. Also, during December 1923 petitioner paid to the United States Government for Internal Revenue stamp taxes thereon, the amount of $3,500. The total amount of such expenditures $3,960.00 was entered by petitioner upon its books as an expense and included in its deductions from gross income as reflected on its tax return for 1923. The Commissioner has disallowed $3,938.00 being a portion of the total amount thus claimed, and has allowed as a deduction in the said year 1923, the amount of $22.00 representing an aliquot proportion thereof to the total life of the bonds finally issued.

On the brief, the respondent concedes that the $6,955.50 paid by the petitioner for internal revenue stamps in connection with its issuance of the "Equipment Trust 5% Gold Certificates" of 1923, dated February 1, 1923, is a proper deduction, in its entirety, in computing net income for 1923, and that he erred in disallowing the deduction of any portion of this item. However, the respondent's concession might well have been extended to include the $3,500 paid by the petitioner for internal revenue stamps in connection with its issuance of the "Equipment Trust 5% Series A Bonds" dated December 1, 1923, for the stipulated facts bring it, too, within the rule announced in *United States Playing Card Co.*, 15 B. T. A. 975; *Commercial Investment Trust Corp.*, 28 B.T.A. 143. Cf. *Holeproof Hosiery Co.*, 11 B.T.A. 547; *Borg & Beck Co.*, 24 B.T.A. 995. The net income determined in the deficiency notice for 1923 will be adjusted accordingly.

The question of the time of deduction, for income tax purposes, of expenses incurred in connection with the issuance of term securities has been considered by the Board on several occasions, and it has been held consistently that a true reflection of the net income of the period for which the securities were issued requires that such expenses shall be amortized over that period and an aliquot part thereof deducted in each taxable year. *Emerson Electric Mfg. Co.*, 3 B.T.A. 932; *Chicago, Rock Island & Pacific Ry. Co.*, 13 B.T.A. 988; *Julia Stow Lovejoy*, 18 B.T.A. 1179; *Kansas City Southern Ry. Co.*, 22 B.T.A. 949; *Sigmund Spitzer*, 23 B.T.A. 776; *Emil W. Carlson*, 24 B.T.A. 868; *Union Pacific R.R Co.*, 26 B.T.A. 1126; *W. P. Brown & Sons Lumber Co.*, 26 B.T.A. 1192. Cf. *Bonwit Teller & Co.* v. *Commissioner*, 53 Fed. (2d) 381. We are not impressed with the petitioner's argument attacking the validity of these decisions; it contains nothing that is not fully and adequately answered by them.

We are not aware of any substantial reason for the application of a different rule to the expenses incurred in connection with the issuance of the temporary certificates due to the fact that the definitive bonds were not ready at the issuing date.

They are as much a part of the cost of procuring the loan as any of the other expenses directly related to the definitive bonds. Since the respondent's treatment of the expenses incurred in 1920 and 1923, incident to the issuance of term securities in those years, conforms with the rule above announced, we approve his determination in that respect, subject only to the necessary revision of 1923 net income, required by the above decision on the two amounts expended for internal revenue stamps.

## IV.

As an alternative to Issue III the petitioner claims as a deduction in each taxable year the sum of $111,216.11, representing amortization of like expenses incurred in prior years.

In years prior to 1920 the petitioner issued bonds and in connection therewith expended certain amounts. The date of issuance of such bonds, the description and term of issue, the nature of expenditures, and amount thereof, were as follows:

| Date of issue | Description and term of issue | Amounts expended in connection therewith | |
|---|---|---|---|
| | | Item and nature | Amount |
| March 1, 1913 | 3% 20-year Convertible bonds—entire principal due 3/1/1933 $63,250,000. | Commission paid to Kuhn Loeb & Co. and Speyer & Co. for underwriting sale of bonds at 95½ paid in March 1913. | $1,897,500.00 |
| April 1, 1913 | Equipment Trust 4½% certificates of 1913 totaling $10,000,000 due $1,000,000 on Apr. 1 of each year from Apr. 1, 1914, to April 1, 1923. | Vendors compensation paid Dec. 1913 | 100,000.00 |
| May 1, 1916 | Equipment Trust 4½% certificates of 1916 totaling $5,000,000 payable $500,000 annually from May 1, 1917, to May 1, 1926. | Commission to Kuhn Loeb & Co | 62,500.00 |
| | | Legal expenses | 2,172.31 |
| | | Services of trustee | 3,796.87 |
| | | Printing | 2,888.75 |
| | | Recording and other incidental expenses. | 544.14 |
| | | Total disbursements | 71,882.07 |
| | | Less: Premium collected on sale of certificates. | 45,459.00 |
| | | Balance paid in 1916 | 26,423.07 |
| Dec. 1, 1915 | Refunding and General Gold 5s Series "A", total of $60,000,000 entire principal due Dec. 1, 1995. | Listing on N.Y. Stock Exchange | 3,000.00 |
| | | Recording, printing and services of Trustee. | 85,756.60 |
| | | Total paid in 1915 | 88,756.60 |
| Apr. 2, 1917 | Equipment Trust 4½% certificates of 1917, totaling $10,000,000 of which $1,000,000 payable annually on April 1 of each year from Apr. 1, 1918, to Apr. 1, 1927. | Trustees services and expenses | 7,593.75 |
| | | Printing and other costs of issuance | 9,624.69 |
| | | Total paid in 1917 | 17,218.44 |
| June 25, 1917 | Toledo-Cincinnati division, First Lien and Refunding Gold 4s, Series A, totaling $11,250,500 due July 1, 1959. | Services of Trustee | 5,666.45 |
| | | Printing | 11,165.00 |
| | | Signing, recording, legal fees and listing. | 1,943.20 |
| | | Total paid in 1917 | 18,774.65 |
| July 1, 1919 | Ten Year Gold 6% Bonds totaling $35,000,000 due July 1, 1929. | Printing and other incidental expenditures paid in 1919. | 5,213.10 |

The commissions of $1,897,500 paid to Kuhn Loeb & Co. and Speyer & Co. were paid for services rendered in March 1913.

The petitioner charged such expenditures upon its books as expenses in the years so paid, as hereinabove set forth, and claimed and was allowed such expenses in its tax returns for the respective years. In his computation of the deficiencies involved here the respondent did not allow any part of these expenditures as a deduction.

Due to the magnitude of its business, the accounting practice of the petitioner is to audit and account for expenses such as those incident to the issuance of securities, when the bills therefor are received. The petitioner has consistently charged expenses incident to the issuance of securities to profit and loss in their entirety in the years when paid, pursuant to regulations of the Interstate Commerce Commission effective July 1, 1914. The net income reported in its tax returns has been consistently computed by it in conformity with that practice.

The respondent contends that the petitioner's claim of a right to amortize the expenses over the terms of the securities and deduct aliquot parts thereof in each taxable year in the face of the fact that the several amounts were allowed in full in returns for prior years " is not maintainable, because it is in contravention of equitable principles operating by way of estoppel." The petitioner says that the respondent should be consistent in the application of his theory as to the manner in which expenses of the kind here involved should be recovered for tax purposes, and if the doctrine of estoppel is to be applied, it should operate against the respondent, " who seeks to break the implied agreement, not against the petitioner who seeks to uphold it."

We do not think the question involves the violation of any implied agreement between the parties as to the period when expenditures of this sort should be deducted from gross income. The Commissioner of Internal Revenue must look to statutory authority for allowance of claimed deductions. He frequently makes alterations in his rulings and regulations respecting the deductibility of the various kinds of expense items, often as the result of judicial and other interpretation of revenue acts, and we do not think he violates any rule of equity in doing so. That is simply what he did here; nothing more.

The petitioner elected to claim the expenses as deductions in the respective years in which they were incurred, rather than exhaust them ratably over the life of the bonds. The respondent allowed the claims, thus giving the petitioner the full benefit of the applicable revenue acts as he then interpreted them. Refusal to allow aliquot portions of the expenses as deductions in the taxable years, when the bar of the statue of limitations precludes adjustments in petitioner's

income tax returns for years prior to 1920, is, we think, consistent with, rather than contrary to, principles of equity. The petitioner is in no position to contest the legality of the claims it made. *Magee v. United States*, 282 U.S. 432; *Alice H. Moran v. Commissioner*, 67 Fed. (2d) 601; affirming 26 B.T.A. 1154; *Alpin J. Cameron*, 8 B.T.A. 120; *Graves, Cox & Co.*, 27 B.T.A. 546. See *R. H. Stearns Co. v. United States*, 291 U.S. 54.

Expenditures of the kind in question have been held to " result in property of a sort and its cost is being exhausted proportionately over a period of years and should be provided for on the basis of time, production, or otherwise. Sec. 214 (a) (8) [1924 Act]." *Julia Stow Lovejoy, supra.*

The Board and the courts have heretofore held that taxpayers may not recover by way of deductions exhaustion in excess of the cost or other basis for property. *Alpin J. Cameron, supra; Elliott-Granite Linen Corp.*, 26 B.T.A. 936; *Graves, Cox & Co., supra; Cameron v. Commissioner*, 56 Fed. (2d) 1021; affirming 20 B.T.A. 305. Upon the sale of an asset, the cost of which has been charged to expense or fully recovered by deductions for depreciation, taxable income is realized to the extent of the selling price of the property. *Gardner Printing Co.*, 4 B.T.A. 37. It is also the rule that where a bad debt has been allowed as a deduction, any recovery thereof in subsequent years represents taxable income to the creditor. *Askin & Marine Co.*, 66 Fed. (2d) 776; affirming 26 B.T.A. 409; *Commissioner v. Liberty Bank & Trust Co.*, 59 Fed. (2d) 320; reversing 14 B.T.A. 1428; *Putnam Nat. Bank v. Commissioner*, 50 Fed. (2d) 158. Returns on expenses previously allowed as deductions constitute taxable income. *Burnet v. Sanford & Brooks Co., supra.* The same is true as to deductions taken for amounts embezzled. *South Dakota Concrete Products Co.*, 26 B.T.A. 1429.

If the petitioner is in a position to assert a right to further deductions for the expenses in controversy, we are of the opinion that the question is also controlled by the principles of the cases just cited. On this issue we sustain the respondent.

## V.

The petitioner alleges that it was error for the respondent to include in its income for 1920 and 1923 the amounts of $4,711.25 and $2,762.50, respectively, representing the difference between the issuing price of certain bonds and the amounts at which the securities were purchased in the taxable years. The respondent now concedes that he erred as alleged.

The following are general facts relating to Issues VI to IX, inclusive.

### FACTS IN REFERENCE TO ISSUES VI TO IX

The petitioner and certain of its subsidiaries, Baltimore & Ohio Chicago Terminal Co., Sandy Valley & Elkhorn Railway Co., Staten Island Rapid Transit Co., Coal & Coke Railway Co., and Long Fork Railway Co., are railroad and transportation systems and/or railroad terminal systems within the territorial limits of the United States, keeping books of account of operations and financial condition under the mandatory accrual system of accounting promulgated by the Interstate Commerce Commission.

By proclamation the President took possession and assumed control of all systems of transportation within the territorial limits of the United States at noon, December 28, 1917.

On March 29, 1918, the President, acting in accordance with the terms of the Federal Control Act, approved March 21, 1918, and all other powers him thereto enabling, issued a proclamation authorizing the Director General of Railroads to agree with carriers upon the amount of compensation to be paid them.

On February 28, 1920, the President approved the Act of Congress commonly called the Transportation Act, by the terms of which it was directed that said control of railroads and transportation systems should terminate at 12 a.m., March 1, 1920, and that the President should then relinquish possession and control of all railroads and systems of transportation then under Federal control and cease the use and operation thereof. This statute further authorized the President to make agreements in final settlement of all matters arising out of Federal control.

In accordance with the terms of this act, the President did, on March 1, 1920, relinquish possession of the railroad systems of the petitioner and its subsidiaries and turn back to the petitioner and its subsidiaries all properties then comprising such systems.

On the petitioner's books the Director General was charged with certain assets as they had appeared on its books at the time the properties were taken over by the Director General. Included among the assets taken over were certain liquid or current accounts such as an inventory of materials and supplies, cash, etc. At and after the conclusion of Federal control the petitioner had on its books of account numerous current or open accounts due from and to the Director General and which accounts had been entered thereon during Federal control and as a result of the termination thereof. These accounts remained on the books of the petitioner corporation while negotiations were entered into between the petitioner and the Director General for the settlement of the numerous claims made by

each party arising out of Federal control with such adjustments as were from time to time made during the negotiations.

The Director General on March 1, 1920, upon the return of the properties to the petitioner, required the petitioner to execute and deliver to him a note payable in the amount of $9,000,000, with interest at 6 percent, as a payment on account of the liability or liabilities owing to the Director General by the petitioner and its affiliates as a result of said Federal control of their transportation and railroad systems.

On July 27, 1922, a final settlement agreement was executed between the Director General and the petitioner and some of its affiliates. In accordance therewith the petitioner delivered to the Director General its voucher check for one dollar. In accordance with an order of the Interstate Commerce Commission, the corporations, after final settlement with the Director General as aforesaid, and in 1923, cleared from their books to the credit of its profit and loss account all the many accounts appearing thereon in reference to Federal control.

## VI–VII.

These issues will be considered together. The first issue relates to the disallowance of a deduction for 1923 of $462,559.40, representing the aggregate loss sustained by the petitioner and three of its subsidiaries from the Interstate Commerce Commission's revision downward in that year of its certificate of standard returns for just compensation for Federal control. The second issue concerns the disallowance in 1923 of $81,483.45, representing the aggregate loss sustained by the petitioner and four of its subsidiaries from the Director General's allowance of compensation for the two-month period of Federal control, January 1 to February 29, 1920, on the basis of 60/366 instead of 2/12 of the average annual compensation.

During the early part of 1919 the Interstate Commerce Commission certified to the President the average annual operating income of the corporations indicated, as follows:

| | |
|---|---:|
| Baltimore and Ohio R. R. Co | $25,611,892.07 |
| Baltimore and Ohio Chicago Terminal Co | 1,255,201.77 |
| Sandy Valley & Elkhorn Railway Co | 391,921.06 |
| Staten Island Rapid Transit Ry. Co | 356,823.70 |
| Coal and Coke Railway Co | 282,322.54 |
| Total | 27,898,161.14 |

The corporations entered into a contract with the Director General on June 24, 1919, providing that the " annual compensation guaranteed to the Companies under Section 1 of the Federal Control Act shall be the sum of " $30,031,009.14 during 1918, $30,035,093.14 during each additional year, " and pro rata for each fractional part of a

year during Federal control, subject, however, to any increase or decrease in the standard return hereinafter made by the Commission as provided in paragraph (e) of the preamble of this agreement."

The parties have stipulated as follows:

The petitioner corporations accrued on their books and reported as income in their tax returns in each of the years 1918, 1919 and 1920 the amounts so certified, and stated in their contract, as follows:

| Company | 1918 | 1919 | 1920 (2 months) |
|---|---|---|---|
| Baltimore and Ohio R.R. Co. (including Coal and Coke Ry. Co.) | $28,027,062.61 | $28,031,146.61 | $4,671,857.78 |
| Baltimore and Ohio Chicago Terminal R. R. Co | 1,255,201.77 | 1,255,201.77 | 209,200.30 |
| Staten Island Rapid Transit Company | 356,823.70 | 356,823.70 | 59,470.62 |
| Sandy Valley & Elkhorn R. R. Co | 391,921.06 | 391,921.06 | *68,215.04 |
| | $30,031,009.14 | $30,035,093.14 | $5,008,743.74 |

* Includes balance of final certificate rendered October 19, 1920, as set forth hereinafter.

Thereafter, in the years hereinafter set forth, the Interstate Commerce Commission, as a result of further audit and examination of the petitioner's reports and accounting records for the three years ending June 30, 1917, revised its certificate to the President of the United States of the amount of average annual railway operating income for the test period and issued final certificates, * * * as follows:

| Date of certificate | Company | Amount |
|---|---|---|
| January 5, 1922 | The Baltimore and Ohio Railroad Co | $25,471,593.75 |
| July 27, 1921 | Coal and Coke Railway Co | 278,622.75 |
| May 23, 1922 | The Baltimore and Ohio Chicago Terminal R.R. Co | 1,185,710.93 |
| October 19, 1920 | Sandy Valley & Elkhorn Ry. Co | 393,257.15 |

The original certificate of the Staten Island Rapid Transit Railway Company in the amount of $356,823.70 and special compensation due the Baltimore and Ohio Railroad as determined in the amounts of $2,132,848.00 and $2,136,-932.00 for the calendar years 1918 and 1919 respectively, as above referred to, were never changed. Petitioners entered upon their books the reductions of compensation resulting from such revision of the certificate of average annual railway operating income for the three years ending June 30, 1917 and claimed the amounts thereof as deductions from gross income in their tax return for 1923, as follows:

Baltimore and Ohio Railroad Company (including the Coal and
Coke Railway Company) _____ $311,995.91
Baltimore and Ohio Chicago Terminal Company_____ 150,563.49

The Commissioner has held that said adjustments should be made respectively in the years 1918, 1919 and 1920 and has adjusted net income for the 1920 and 1923 years as follows:

| | 1920 reduction | 1923 addition |
|---|---|---|
| The Baltimore and Ohio Railroad Company | $23,999.69 | $311,995.91 |
| Baltimore and Ohio Chicago Terminal Co | 11,581.81 | 150,563.49 |
| S andy Valley and Elkhorn Railway Company | 2,672.19 | |

In the final settlement the Director General ruled, and the petitioner accepted such ruling, to the effect that the proper basis for prorating the compensation for the use and operation of the properties of the petitioner for the period January 1, 1920 to March 1, 1920 should be 60/366ths of the annual compensation in lieu of 2/12ths of said annual compensation as had been accrued by and claimed by the petitioner, thereby reducing the compensation by the following amounts:

Baltimore and Ohio Railroad Company (including the Coal and Coke
  Railway Company) _____ $76,194.41
Baltimore and Ohio Chicago Terminal R.R. Co_____ 3,239.65
Staten Island Rapid Transit Co_____ 974.93
Sandy Valley & Elkhorn R.R. Co_____ 1,074.46

The petitioners, in 1923, entered such reduction of compensation on its books and claimed the amounts thereof as deductions from gross income shown in their tax return for such year. The Commissioner has disallowed the amounts thereof as a deduction in 1923, thereby increasing the taxable income for such year, and has correspondingly reduced taxable income for 1920.

Immediately after the Federal Control Act was passed by Congress, the Interstate Commerce Commission called upon all carriers for a statement of their net railway operating income for the three years ending June 30, 1917, commonly referred to as the test period. The petitioner and its Federal controlled subsidiaries furnished the Commission with sworn certificates of standard return according to their accounts, but served notice on the Commission that they did not think the standard return, as reflected by the accounts, clearly reflected the income to which they were entitled under the Federal Control Act and that later they would file with the Commission a list of claims which they thought should be taken into consideration in properly stating the compensation. Later, in 1918, the Commission called for additional information, particularly with reference to the adjustment of Federal income taxes.

The certificates of standard returns of the petitioner and its Federal controlled subsidiaries issued by the Commission were tentative certificates, each containing the following statement:

This certification is made subject to such changes and corrections as the Commission may hereafter determine and certify to be requisite in order that the accounts and reports of the company used by the Commission as the basis of computing said average annual railway operating income may be brought into conformity with the accounting rules or regulations of the Commission in force at the time of such accounting, or in order to correct computations based on such accounts or reports.

Following the issuance of these tentative certificates of standard returns, the Commission made very intensive examinations of the accounts of the companies concerned, which extended over a long period. In January 1920 the Commission first presented a list of exceptions to the companies. The companies disagreed with the

Commission and were in constant communication, argument, and contention with the Commission, in respect of its accounting exceptions, until December 1921.

The final certificates of standard returns of the petitioner and its Federal controlled subsidiaries issued by the Commission contain the following statement:

This certification is made as a result of certain changes and corrections which the Commission has subsequently determined and hereby certifies to be requisite in order to bring the accounts and reports of the company used by the Commission as the basis of computing said average annual railway operating income into conformity with the accounting rules or regulations of the Commission in force at the time of such accounting, or in order to correct computations based on such accounts or reports.

Until the issuance of these final certificates, the companies had no knowledge of just what changes would be made in their compensation, due to changes by the Commission in their standard returns, and at December 31, 1919, they had received no notification that the Commission had taken exceptions to the accounts of the companies.

When final settlement was made with the Director General in July 1922 there were still a number of items left unsettled. These included the so-called trust fund accounts excepted by the final settlement agreement. They also included the claim of the Railroad Administration for revenues collected during the six months immediately following the termination of Federal control, known as the guaranty period, in the amount of $1,568,554.74. The Director General claimed that this amount belonged to the Federal control period and that the petitioner was liable to him for that amount. These items remained in dispute until June 9, 1923, when they were finally settled, the aforementioned claim of the Railroad Administration being settled for the sum of $900,000. These claims and items being held in abeyance and unsettled, the adjustments of compensation, referred to in the stipulation, were not entered upon the books of the companies concerned until the final settlement of all disputes in 1923.

In 1920 the petitioner accrued during each of the months of January and February $\frac{1}{12}$ of the annual compensation stated in the standard contract. This conformed with the petitioner's accounting practice of accruing annual charges, such as interest, taxes, and rentals, on a monthly basis. Prior to 1922 the petitioner had no knowledge that the Director General would allow compensation for the period January 1 to February 29, 1920, on the basis of $\frac{60}{366}$ of the annual compensation, in lieu of $\frac{2}{12}$ of such annual compensation accrued on the books and reported in the tax return.

Section 1 of the Federal Control Act of March 21, 1918 (40 Stat. 451), provides that the carrier and the President may agree upon just compensation for the use of the properties taken over by the

President. By the act it is to be an annual sum for each year of Federal control not exceeding the carrier's railway operating income for three years ended June 30, 1917. This is referred to as the standard return, and, where this is accepted by the carrier, the average annual railway operating income as determined by the Interstate Commerce Commission is conclusive. By the same section 1, where the standard return is for any reason plainly inequitable as the measure of just compensation, the President is authorized to agree with the carrier upon such amount as just compensation as he shall find to be just under the circumstances of the particular case. It makes no distinction between just compensation based upon a standard return or any other basis. It does provide for compensation at an annual rate. *Commissioner* v. *Old Dominion S.S. Co.*, 47 Fed. (2d) 148. Early in 1919 the Interstate Commerce Commission certified to the President the standard returns of the petitioner and four of its Federal controlled subsidiaries, the aggregate amount of which was $27,898,161.14. The Federal control standard contract entered into between the petitioner and its subsidiaries with the Director General, after reciting that the Commission had certified a standard return for the companies in the aggregate amount above stated, that such standard return was inequitable as a fair measure of just compensation, that the Director General should pay additional compensation of $2,132,848 for 1918 and $2,136,932 for each year after 1918, fixed the annual compensation guaranteed to the companies at $30,031,009.14 for 1918 and $30,035,093.14 for each year after 1918, and pro rata for each fractional part of a year during Federal control, but these amounts were fixed " subject, however, to any increase or decrease in the standard return hereafter made by the Commission." On their books for 1918, 1919, and 1920 the companies accounted for compensation in the aggregate sums of $30,031,009.14, $30,035,093.14, and $5,008,743.74, respectively, and similar amounts were reported as compensation income in the returns of those years. Before the close of 1920 the Commission had made its final certification of the standard return for the Sandy Valley & Elkhorn Railroad Co., which showed an increase over the tentative certification; so that the amount of compensation income accounted for on the books for 1920, and reported in the return for that year, was $\frac{2}{12}$ of the annual compensation of $30,035,093.14 tentatively guaranteed in the contract for each year after 1918, plus the increase in the standard return of the Sandy Valley & Elkhorn Railroad Co. indicated by the Commission's final certification for that company. The Commission's tentative certification of standard return for the Staten Island Rapid Transit Co. was never changed. In the early part

of 1920 the Commission took exception to the test period accounts of the petitioner, the Baltimore & Ohio Chicago Terminal Railroad Co. and the Coal & Coke Railway Co., and until December 1921 the three companies were in constant communication, argument, and contention with the Commission in respect of these accounting exceptions. In 1921 and 1922 the Commission issued final certifications of the standard returns of these three companies, the aggregate amount of which was $213,488.95 less than its earlier tentative certifications. On the basis of these final certifications, the aggregate compensation to these three companies for the whole of the Federal control period was $462,559.40 less than the aggregate of amounts of compensation income accounted for on the books and reported in the tax returns. This amount of $462,559.40 was deducted from income in the 1923 return, and it is one of the items in dispute here. The respondent disallowed the deduction, holding that the book adjustments of compensation income made necessary by the Commission's final certifications related to the accounting periods for which the compensation was allowed.

On their books and in the tax return for 1920, the petitioner and its four Federal controlled subsidiaries accounted for compensation for the Federal control period January 1 to February 29, 1920, in an amount equal to $\frac{2}{12}$ of the annual compensation. In final settlement the Director General allowed the compensation for the two-month period in an amount equal to $\frac{60}{366}$ of the annual compensation, which was $81,483.45 less than the amount accounted for on the books and reported in the tax return. This amount of $81,483.45 was deducted from income in the 1923 return, and it is one of the items in dispute here. The respondent disallowed the deduction, but reduced the net income reported for 1920 by a like amount.

The petitioner contends that the amounts of compensation income reported in the returns for 1918, 1919, and 1920 should be permitted to stand; and that the difference between the aggregate of those amounts and the aggregate compensation received from the United States, $544,042.85 ($462,559.40 plus $81,483.45), should be reflected in the net income for 1923 by way of a loss deduction of that amount.

The just compensation received from the United States Government for the use of railroad properties during the period of Federal control, by a carrier keeping accounts on an accrual basis, is income for each of the accounting periods for which the compensation was allowed. *Illinois Terminal Co.*, 5 B.T.A. 15; *Cincinnati, Findlay & Ft. Wayne Ry. Co.*, 5 B.T.A. 108; *New Orleans, Texas & Mexico Ry. Co.*, 6 B.T.A. 436; *Great Northern Ry. Co., supra; Chicago, Rock Island & Pacific Ry. Co., supra; Old Dominion Steamship*

*Co.*, 16 B.T.A. 264; affd., 47 Fed. (2d) 148; *Indiana Harbor Belt R.R. Co.*, 16 B.T.A. 279; *Kansas City Southern Ry. Co.*, 16 B.T.A. 665; affd., 52 Fed. (2d) 372; certiorari denied, 284 U.S. 676; *Midland Valley R.R. Co.*, 19 B.T.A. 423; affd., 57 Fed. (2d) 1042; *Gulf, Mobile & Northern R.R. Co.*, 22 B.T.A. 233; *Missouri Pacific R.R. Co.*, 22 B.T.A. 267; *Kansas City Southern Ry. Co.*, 22 B.T.A. 949; *International-Great Northern R.R. Co.*, 24 B.T.A. 726; and *St. Louis Southwestern Ry. Co.*, 24 B.T.A. 917. Under this rule, the petitioner and its subsidiaries were required to return, as income of the accounting periods for which the compensation was allowed, only the actual amounts received from the Government. Having returned more than that, the income of those periods was overstated; but that will not suffice now as a basis for deducting the excess as losses in a later year. *Missouri Pacific R.R. Co., supra.* Their proper remedy was to file amended returns, or claims for refund of taxes overpaid, for the earlier periods; and the fact that they failed to so protect their interests, with the consequence that the statute of limitations now bars the recovery of such overpaid taxes, while indeed unfortunate, may not be reflected in the net income of a later year, through an unauthorized deduction. Cf. *Continental Tie & Lumber Co. v. United States*, 286 U.S. 290. We are not impressed with the petitioner's argument that the rule laid down in the earlier cases is invalid. None of the authorities upon which the petitioner relies lends any force to the proposition that a taxpayer, having overestimated its income in one year, may deduct the excess as a loss in a later year. The respondent is entitled to judgment on these two issues.

## VIII.

The question for decision is whether it was error to include in income for 1920 the sum of $3,368,145.69 representing the excess value, after certain unimportant adjustments, of material and supplies turned back by the Director General of Railroads at the end of Federal control over the value of material and supplies turned over to the Director General at the beginning of Federal control.

The Federal control contract entered into between the petitioner and the Director General, dated June 24, 1919, provides, *inter alia*, as follows:

[SECTION 2.—PROPERTY TAKEN OVER.] The railroads and systems of transportation of the Company and of its said Affiliated Companies of which the President has taken over possession, use, control and operation shall be considered as including:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(b) All materials and supplies on hand at midnight December 31, 1917.

[SECTION 4.—OPERATION AND ACCOUNTING DURING FEDERAL CONTROL.] (g) The Director General shall furnish for additions, betterments and road

extensions to the Companies' property approved or ordered by him any of the materials and supplies taken over under paragraph (b) of section 2 hereof. or purchased by him and held for use in connection with the Companies' property, in so far as, in his judgment, he can do so with due regard to his own requirements. Materials and supplies so furnished shall be charged to the Companies at cost.

[SECTION 9.—FINAL ACCOUNTING.] (b) At the end of Federal control the Director General shall return to the Companies all uncollected accounts received by him from them and also materials and supplies equal in quantity. quality, and relative usefulness to that of the materials and supplies which he received, and to the extent that the Director General does not return such materials and supplies he shall account for the same at prices prevailing at the end of Federal control. To the extent that the Companies receive materials and supplies in excess of those delivered by them to the Director General they shall account for the same at the prices prevailing at the end of Federal control and the balance shall be adjusted in cash.

At the beginning of Federal control the petitioner and its Federal controlled subsidiaries turned over to the Director General an inventory of materials and supplies of the cost value of $15,602,906.08, and charged that amount on their books to the Director General. At the end of Federal control, the companies received back from the Director General an inventory of materials and supplies of the cost value of $20,113,431.53, and credit for that amount was entered on the books in favor of the Director General. The said charge and credit to the account with the Director General were carried on the books until the final clearance of all Federal control accounts in 1923.

In the final settlement with the Director General there was charged against the companies the amount of $773,357.23 representing the value of materials and supplies in the inventory turned back by the Director General in excess of those delivered by the companies to the Director General. There was also charged against the companies the amount of $369,022.53, representing an adjustment of prices of materials and supplies used by the Director General in additions and betterments to the companies' railroad properties.

The petitioner credited the difference in the values of the two inventories to its profit and loss account in 1923 and reported no income or profit from the replacement of equivalent units of materials and supplies in its tax returns for any year. The respondent increased the net income reported in the 1920 return by $3,368,145.69. The petitioner charges the respondent has included this amount of $3,368,145.69 in gross income as a taxable gain. Any such action on the part of the respondent would justify a conclusion that there is error in his determination of a deficiency; for the return to the companies by the Director General, at the end of Federal control, of materials and supplies equal in quantity, quality, and relative usefulness to those delivered to the Director General at the beginning of Federal control, does not give rise to taxable income, although the

value at the time returned may exceed the value when delivered. *Indiana Harbor Belt R.R. Co., supra.* But we do not think the facts support the charge.

In the 30-day letter upon which the deficiency notice was based, the respondent added, under the heading " Unallowable deductions and additional income," to the net income reported in the return the item " Materials and Supplies, $3,368,145.69," with the following explanation:

This amount represents the increase in inventory value of material and supplies taken over from the United States Railroad Administration at the termination of Federal control, February 29, 1920, and charged out at such increased prices, is considered taxable income during the current year.

| | | |
|---|---|---|
| Value of material and supplies turned over to Director General of Railroads at beginning of Federal control January 1, 1918 | | $15, 601, 927. 21 |
| Adjustments in prices by the Director General of Railroads | | 978. 87 |
| Total | | $15, 602, 906. 08 |
| Value of material and supplies taken back from Director General of Railroads at end of Federal control, February 29, 1920 | $20, 113, 712. 06 | |
| Less adjustment in prices by Director General of Railroads | 280. 53 | |
| | | 20, 113, 431. 53 |
| | | $4, 510, 525. 45 |
| Less: Amount allowed the Director General of Railroads in the final settlement, representing the value of excess material turned back | 773, 357. 23 | |
| Amount deducted in the final settlement, representing an adjustment of prices on material and supplies used in additions and betterment work | 369, 022. 53 | |
| | | 1, 142, 379. 76 |
| Additional taxable income | | $3, 368, 145. 69 |

We think it is clear from the foregoing that the respondent, in redetermining the taxable net income for 1920, has disallowed a portion of the petitioner's deduction for ordinary and necessary expenses —the disallowed portion being the amount in controversy—on the ground that the materials and supplies received back from the Director General had been used in, and were charged to expense of, the taxable year at the increased value; and the disallowance resulted in income shown in the return being increased. Cf. *Chicago Junction Rys. & Union Stock Yards* v. *United States,* 52 Fed. (2d) 906.

The stipulated facts show that the materials and supplies turned back by the Director General, which included, among others, the same number of units and kinds of materials and supplies that were

turned over to the Director General, were entered upon the books of the companies at a value of $3,368,145.69 greater than the cost to them of the materials and supplies which they turned over to the Director General at the beginning of Federal control. In all probability, therefore, when and as the materials and supplies so turned back by the Director General were used, they were charged to expense at the increased value. That, at least, is the respondent's determination, and there are no facts in this record which establish that such determination is error. Since the transaction involved only a substitution of fungibles of like quantity, quality, and relative usefulness, the materials and supplies turned back by the Director General took, for the purposes of computing taxable net income, the same cost as the materials and supplies turned over by the companies, rather than the greater value at the time of return by the Director General, and they should have been charged to expense at the lower figure. *Terminal R. R. Assn. of St. Louis*, 17 B.T.A. 1135, 1166. On this issue, the respondent's determination is approved.

## IX.

The petitioner alleges as error the respondent's action in disallowing as a deduction in 1920 the sum of $5,589,968.23 representing a portion of its expenditures for maintenance of properties during the ten months of 1920 immediately following Federal control.

On March 1, 1920, when the petitioner's railroad system was returned by the Director General, there existed a serious condition of undermaintenance of ways and structures, which had accumulated during Federal control due to the failure to apply sufficient labor and material to the maintenance thereof during that period. Track and roadbed conditions were poor as a result of the failure of the Director General to renew sufficient quantities of rail, ties, and ballast. Ditching work had not been adequately done and little restoration of banks and slopes had been made. Ties, rail, and ballast such as had been used in renewals were largely of inferior grades. Switching and terminal yards had deteriorated from heavy usage and lack of sufficient replacements. In some cases, the harmful effects of floods, extreme cold, and other weather conditions had not been corrected. Buildings, bridges, and other structures had suffered because of insufficient maintenance work and repairs. On November 6, 1919, the petitioner's chief engineer and the Railroad Administration's general superintendent of maintenance jointly determined, after an inspection of the properties, that there had been a shortage of replacements during Federal control, as compared with the test period, amounting to 77,291 tons of new rail, 1,179,957 ties, and 353,789 tons of stone ballast. This shortage in replacements was not made up or overcome prior to March 1, 1920.

Subsequent to the termination of Federal control, the petitioner filed a claim with the Director General in respect of matters arising out of Federal control in which approximately $35,000,000 was claimed as due the companies for undermaintenance of properties. Of that amount, approximately $8,000,000 was claimed for undermaintenance of ways and structures. During the negotiations leading to the final settlement of Federal control in July 1922 the Director General claimed approximately $40,000,000 as due him from the companies for overmaintenance of properties during Federal control. The claims of both parties were the subject of prolonged discussion before final settlement was made; but no agreement was reached between the parties on their respective claims for undermaintenance and overmaintenance, and the petitioner was not advised, and never knew, of any allowance by the Director General in the final settlement for undermaintenance of the companies' properties.

In December 1923 the petitioner entered upon its books of account all of the items arising out of Federal control of which it had knowledge. It recorded final adjustments as made for compensation, interest on additions, and betterments made during Federal control and charged against the companies, the charge of $773,357.23 for excessive quantities of materials and supplies returned, the charge of $369,022.53 for adjustment of price of materials and supplies used in additions and betterments, adjustments to depreciation, road property retired and not replaced, and many other adjustments alleged to have been agreed upon by the parties in final settlement.

Pursuant to an order of the Interstate Commerce Commission issued January 25, 1922, and following the foregoing journal entry, the petitioner, by journal entry No. 96 of December 1923, cleared its books, to the credit of profit and loss, of all accounts relating to Federal control.

No amount was ever entered on the petitioner's or the companies' books reflecting any agreement in respect of, or any allowance by the Director General for, undermaintenance of ways and structures during Federal control.

During the last ten months of 1920 the petitioner expended the sum of $30,906,508.93 for maintenance of its ways and structures. This amount it charged to its railway operating expense account "Maintenance of Ways and Structures" in accordance with the accounting regulations of the Interstate Commerce Commission and claimed as a deduction from gross income in its 1920 income tax return. The respondent, in determining the deficiency here involved, has disallowed as a deduction from gross income $5,589,968.23 of the amount thus expended and claimed for maintenance of ways and structures, on the ground that to that extent the petitioner's maintenance expenditures of the ten-month period were to

make good or overcome the undermaintenance of the Federal control period, and that the petitioner had been reimbursed to that extent by the Director General in the final settlement of Federal control.

In order to rebuild or rehabilitate the ways and structures of a railroad it is necessary to use rails, ties, ballast, and other materials in excess of that required for normal renewals and maintenance, and if, during a period following deferred maintenance, normal renewals and replacements are not made, the condition of the property becomes worse.

Three methods are customarily used by railroad engineers to determine whether maintenance expenditures during a certain period are normal, subnormal, or abnormal, and whether deferred maintenance existing at the beginning of a period has been made up during that period. These methods are:

1. A comparison of quantities of material used during a normal period and the particular period.

2. A comparison of the expenditures during the respective periods, with a proper allowance for differences in cost of labor and material, amount of property employed and use of the property.

3. A physical inspection of the property at the beginning and end of the particular period.

The test period comprising three years ending June 30, 1917, was a period fairly representative of normal maintenance of the ways and structures of the petitioner. Applying the method set forth in Interstate Commerce Commission Finance Docket No. 1606, decided December 15, 1921, the petitioner expended during the last ten months of 1920 for maintenance of ways and structures $2,401,-525 less than would have been necessary to expend during that period to equal normal maintenance during the test period.

The foregoing method of computation makes allowance for the cost of labor, but does not make provision for differences in effectiveness of labor. During 1920 there was a shortage of labor, which made it necessary for the petitioner to employ inexperienced help, some prison labor, and at times import laborers and operate commissary camps for them. These conditions prevented the petitioner from obtaining normal results from its expenditures for labor. Using as a basis the formula set forth in Interstate Commerce Commission Finance Docket No. 1606, *supra*, but making allowances for ineffectiveness of labor during the last ten months of 1920, and using a different method for arriving at the allowance for increase in the amount of property maintained, the expenditures of the petitioner for maintenance of ways and structures during the last ten months of 1920 were $4,679,512 less than in an average ten months of the test period.

The petitioner used substantially less quantities of material in the maintenance of track during the last ten months of 1920 than during

the average of like periods during the test period. The difference, measured in dollars, with due allowance for increased mileage of track and use of the property was $1,248,904.

The petitioner does not have detailed records of the units of material used in bridges and other structures, and it is not possible to identify the various kinds of material utilized in the maintenance of such properties. Equating the cost of materials used in bridges and other structures during the test period to 1920 prices and making certain allowances for additional property acquired and cost of labor, the physical reparation derived by the petitioner from expenditures on bridges and structures during the last ten months of 1920 was $1,085,045 less than that obtained during an average ten months of the test period for placing the same relative amount of upkeep material in the structures.

Exhibits 1, 2, 3, 4, 5, and 6, forming the basis of our foregoing findings of fact respecting deficits in maintenance of ways and structures, are incorporated herein by reference.

The average quantities of new rail, repair rail, ties, and ballast used for each mile of track owned by the petitioner in 1920 compares with the average quantities of the same materials used during the years 1908 to 1917, inclusive, as follows:

|  | 1908–1917, inclusive | 1920 |
|---|---|---|
| Tons of new rail for mile of main track | 9. 23 | 8. 07 |
| Tons of new and repair rail per mile of all tracks | 10. 35 | 10. 50 |
| Cross ties per mile of all tracks | 259. 00 | 255. 00 |
| Cubic yards of stone and gravel ballast per mile of main track | 86. 00 | 77. 00 |

During 1920 the petitioner used in track work 52,000 gross tons of new rail, 2,529,000 ties and 222,000 tons of ballast. Of the rails, 49,600 tons were used during the last ten months of 1920. The quantities of such material used were less than the requirements for normal maintenance. During 1920 it was the general policy of the petitioner to make emergency repairs rather than rebuild. On some of the divisions only the most defective rails were renewed. Ditching and roadbed maintenance work was subnormal. With the exception of on one division, no paint was applied to bridges, buildings, and other structures in 1920. Work on masonry consisted only of patch repairs. In maintaining the property during the last ten months of 1920, the worst conditions were taken care of first.

During the last ten months of 1920 the petitioner repaired some of the condition of undermaintenance existing on March 1, 1920, in its ways and structures.

The parties do not differ as to the amount actually expended by the petitioner during the last ten months of 1920 for maintenance of

its ways and structures. The respondent questions the deductibility of the whole amount, as claimed by the petitioner, only upon the ground already stated. The petitioner questions the correctness of the respondent's determination upon two grounds—first, that it received no allowance from the Director General for undermaintenance of ways and structures during the Federal control period, and, second, that no part of the expenditures made during the last ten months of 1920 for maintenance of ways and structures was used to make good undermaintenance of such properties on March 1, 1920.

In the statement attached to the deficiency notice the respondent made the following statement in connection with his disallowance of $5,589,968.23 of the amount claimed as a deduction for maintenance of ways and structures:

This item representing expenditures made subsequent to Federal control to rehabilitate your property to the extent of undermaintenance of ways and structures during Federal control for which you were allowed payment in final settlement with the Director General of Railroads, is held not to be an allowable deduction from gross income.

It is firmly established by a long line of cases of this Board and the courts that this finding of the respondent is prima facie correct and that the burden of overcoming it is on the petitioner. Our decision on the first point thus depends upon whether there is in the record of this proceeding evidence sufficient to overcome the presumption of correctness attached to the respondent's determination. Other cases serve only to show an application of the rule, as every question of this sort must be answered in the light of its peculiar facts.

In its petition the petitioner alleged that following the execution of the final settlement agreement on July 27, 1922, the Director General, in order to clear and balance his books relating to transactions had with the petitioner during Federal control, entered in accounts of his books such amounts as would cause them to reflect the sum of $9,000,001 ($9,000,000 note given March 1, 1920, plus the consideration of $1 recited in the agreement), agreed upon as due the Director General, and that in making such adjustments in his books he made an entry in the amount of $5,589,968.23 under the designation "Ways and Structures—Undermaintenance" as a "supposed allowance for undermaintenance." As the amount the respondent found the petitioner received from the Director General for undermaintenance of ways and structures during Federal control equals the figure the petitioner alleges the Director General entered in his books, it would seem that the respondent based his finding upon the Director General's books. But the respondent denied in his answer that the Director General made such an allocation, and there being no evidence on the point, we must solve the problem without knowledge of the foundation for the respondent's finding.

If we were to assume from the unusual condition in which we find the record that entries in the Director General's books led the respondent to make his determination, that fact, standing alone, would not be controlling. *Southern Ry. Co., supra.*

We do know, as already shown, that the petitioner claimed from the Director General for undermaintenance of its properties, including ways and structures, during Federal control, about $35,000,-000, of which $8,000,000 related to ways and structures. The Director General countered with a claim of approximately $40,000,000 for overmaintenance of all of the petitioner's properties. Thus the parties were about $75,000,000 apart as to the physical condition of the properties as of March 1, 1920. In this respect, at least, the facts differ from *New York, Chicago & St. Louis R.R. Co.*, 26 B.T.A. 1229; *Southern Ry. Co., supra;* and *Ann Arbor R.R. Co.*, 29 B.T.A. 331. Nothing of record discloses the extent to which the Director General's claim related to ways and structures. The final settlement was concluded without any meeting of the minds regarding the respective claims for overmaintenance and undermaintenance, with the result that the petitioner never knew or gave recognition on its books of any allowance by the Director General for undermaintenance of its ways and structures.

A very careful consideration of all the evidence bearing upon the question leads us to the conclusion that the petitioner has overcome the presumptive correctness of the respondent's finding. There being no proof that the petitioner received any other sum from the Director General for undermaintenance of its ways and structures during the period of Federal control, we hold that the whole of the amount of $30,906,508.93 expended by the petitioner for maintenance of its ways and structures during the last ten months of 1920 is deductible from gross income in 1920. In view of this answer to the first point, it is not necessary for us to decide the second point.

## XII.

The twelfth issue relates to the disallowance of a deduction for 1923 of $4,932,070.48, representing the aggregate loss sustained by the petitioner and several of its subsidiaries from decisions rendered in that year by the Interstate Commerce Commission as to the amount payable to the several companies under the guaranty provisions of section 209 of the Transportation Act, 1920.

The petitioner and corporations affiliated with it accepted the provisions of section 209 of the Transportation Act. During 1920 they prepared claims for the amount so guaranteed. The amount of the claim, $27,000,000 in round figures, was accrued on their books and reported as income in 1920. Pursuant to an order issued by the Interstate Commerce Commission on December 15, 1921, the

corporations closed out their reserve accounts pertaining to the guaranty period by crediting amounts aggregating about $4,500,000 to income. This sum they reported as income in 1921. Thereafter in 1923 and 1925 the Interstate Commerce Commission rendered revised certificates designating the amounts to be paid for the guaranty period and, in one case, the amount for which the corporation was indebted to the United States for excessive earnings during such period. Following the foregoing decisions and a decision rendered by the Director General that the petitioner was indebted to him in the amount of $900,000 for revenue collected during the guaranty period applicable to the Federal control period, the corporations charged against income and deducted in their return for 1923, amounts aggregating $4,932,070.48. The respondent disallowed the deductions and applied the amounts back to 1920 by eliminating from the income reported for 1920 and 1921 certain stipulated amounts. The amounts payable to the corporations in accordance with the provisions of section 209 of the Transportation Act were liquidated by advances made in 1920 and 1921 and payment in 1923 of the balances due.

During 1920 the Interstate Commerce Commission had under consideration various questions that arose concerning the computation of the payments to be made under section 209, and beginning on October 18, 1920, and from time to time thereafter issued orders dealing with various phases of the question. Numerous conferences and discussions were held between the companies and the Interstate Commerce Commission as to the correct manner of applying section 209 and computing the deficits defined therein. One of these questions was the treatment of lap-over items paid in one period and applicable to other periods which led to order of the Commission on June 10, 1920, providing for the disposition of such items on the books, and it was finally settled by the Commission's order on December 15, 1921.

An important question under consideration, in the said conferences and discussions, was the determination of the method to be used to measure the amount which the carriers could include in operating expenses for maintenance under section 209 (f) (3) of the Transportation Act. The general accountant of the petitioner corporation worked with the officers of the Bureau of Finance in evolving formulae for the application of this section. The discussions in connection therewith continued throughout the year 1921, the carriers contending that the mere equation of labor wages did not comprehend the total difference in " cost " of labor and that allowance should be made for accomplishment. On July 12, 1921, the Interstate Commerce Commission, in a divided opinion, construed the foregoing section to comprehend merely

the equation of price of labor in computing the allowance for maintenance.

On December 15, 1921, after further hearings, the Interstate Commerce Commission issued a decision, Docket 1606, which required that final statements of account for amounts due under section 209 of the Transportation Act should be filed on or before March 1, 1922. This decision also prescribed rules for the limitation of charges to operating expenses and revenues entered on the carrier's books, for the determination of charges to operating expenses for maintenance, for the estimation of the net effect of deferred debit and credit items, for the adjustment of differences in cost of labor and material, and for differences in amount and use of property in computing the amounts to be allowed for maintenance. Prior to the issuance of this decision, the Commission had been experimenting with and evolving tentative formulae with representatives of the carriers, and prior to that time had not established a formula for computing the guaranty deficit.

After issuance of the Commission's decision in Docket 1606, the petitioner prepared and filed claims, under date of April 25, 1922, claiming for the various companies the amounts which they had accrued upon their books, as set forth in the stipulation.

After filing these claims, there were many discussions between the petitioner and the Interstate Commerce Commission about the factors to be applied against expense for the test period, to determine the amount allowable for the guaranty period. The petitioner contended that it had been handicapped by the consideration of a general labor factor because a great many of its workmen had worked piece work. A great deal of analysis was made of reserve accounts for personal injury, loss, and damage and other items of that character. In addition, the comptroller of the Railroad Administration insisted that the petitioner was indebted to the Railroad Administration in the amount of $1,568,554.74 as a result of waybilling freight on through waybills instead of local waybills, which caused a lap-over of revenues at the end of Federal control and the beginning of the guaranty period. These questions were in dispute until June 1923.

On May 28, 1923, the accounting director of the Bureau of Finance of the Interstate Commerce Commission and the comptroller of the petitioner entered into a written agreement that the balance due the petitioner, in addition to previous payments of $20,400,000 set forth in the stipulation filed by the parties, was $4,952,416.08, subject, however, to the understanding that settlement should be made with the Director General of his claim for $1,568,554.74 before final decision should be rendered.

On June 9, 1923, the petitioner agreed to settle the claim of the Director General by admitting that $900,000 was the proper sum

to be taken from the guaranty period and credited to the revenue of the Federal control period. A written memorandum was signed by the comptrollers of the Railroad Administration and of the petitioner corporation to this effect on that day. The comptroller of the Railroad Administration then notified the director of finance of the Interstate Commerce Commission of this settlement and petitioner claimed that its final payment for the guaranty period should be increased by the amount thus transferred to the Director General. The director of the Bureau of Finance refused to allow the full amount, but did agree that the balance due for the guaranty period previously determined on May 28, 1923, should be increased by 80 percent thereof, or $720,000. The director of the Bureau of Finance and the comptroller of the petitioner corporation then signed, on June 9, 1923, a written agreement that the balance to be paid the petitioner in addition to the previous payments should be $5,672,-416.08. On June 13, 1923, the Commission entered its decision in Docket 295, designating the total amount due the petitioner.

The petitioner and several of its subsidiaries sustained railway operating deficits in the guaranty period. Having previously accepted the guaranty provisions of section 209 of the Transportation Act, they were entitled under those provisions to awards by the Interstate Commerce Commission sufficient to enable them to show a net railway operating income for the period equal to one half of the amounts named in their contracts as annual compensation for Federal control. They filed claims with the Interstate Commerce Commission which were prepared in accordance with their own ideas and interpretations of the applicable provisions of the act, and accrued the amounts thereof as income on their books in 1920 and included the same in income in the tax return for that year. On December 15, 1921, the Commission ordered that all guaranty reserve accounts created to reflect accruals pertaining to guaranty period transactions be closed out by adjustment to the basis of actual expenditures or corrected to reflect such estimates and adjustments as the Commission, by section 212 of the act, was authorized to make. The companies complied with this order and, by reason thereof, credited an additional amount on their books to income. This additional amount was included in income in the 1921 return. Thereafter, and until the late summer of 1923, the companies were in continuous conference and dispute with the Commission on numerous questions bearing upon the computation of the amounts to which the companies were entitled, the treatment of lap-over items belonging in one period and paid in another, and the method by which to measure the amount which the companies could include in operating expenses for maintenance under section 209 (f) (3) of the act. A final settlement of all items and questions

in dispute was reached in 1923, and in that year the balance due under the Commission's awards was paid to the companies. The total amount received by the companies was $4,932,070.48 less than the aggregate of amounts which they had reported in the 1920 and 1921 returns. This difference of $4,932,070.48 was claimed as a loss deduction in the 1923 return, the year of final settlement, and was disallowed by the respondent; but the respondent allocated this difference to the years 1920 and 1921, holding that the same should be reflected in reductions of the income of those years, so that the amount left in income for 1920 would not be greater than the aggregate amount actually received by the companies from the United States. It is this action by the respondent which the petitioner challenges as erroneous. The point at issue is clearly controlled by the decision of the United States Supreme Court in *Continental Tie & Lumber Co.* v. *United States, supra;* and under the rule as stated therein, it was incumbent upon the petitioner to include in 1920 income a reasonable estimate of the amount of the award to be paid by the Government, and when the amount of the award was definitely established by agreement or payment, to make "Any necessary adjustment of the tax * * * by an amended return, claim for refund, or additional assessment, as the final award of the Commission might warrant." The rule as stated in the Supreme Court's decision necessarily excludes the deduction, from the income of the year of final settlement, of the amount by which the award was overestimated in the 1920 and 1921 returns. The respondent is entitled to judgment on this issue.

## XIV.

The issue is whether there should be included in gross income for 1920 the sum of $461,956.56 as additional compensation for transportation of mail from November 1, 1916, to December 31, 1917.

Decision 9200, 56 I.C.C. 1, relating to railway mail pay, was rendered by the Interstate Commerce Commission on December 23, 1919, but was not served on the interested parties or made public until January 15, 1920. Thereafter the Post Office Department computed the amounts to be paid various carriers. In 1920 and 1921 it paid the petitioner $259,971.82 and $204,502.33, respectively, a total of $464,474.15. In 1920 the petitioner estimated that it would be entitled to receive $461,956.56, applicable, $73,320.63 to 1916 and $388,635.93 to 1917. The petitioner accrued on its books and reported this amount as income in 1920. In 1921 it accrued, and returned as income, the remaining amount of $2,517.59.

In the petition it was contended that this additional compensation of $461,956.56 was income for the years 1916 and 1917, instead of

1920, the year in which it was included in income by the respondent; but the petitioner now concedes, on brief, that no basis existed for the accrual of this item prior to December 23, 1919, the date of the decision of the Interstate Commerce Commission, and it expresses doubt as to whether the item should be accounted income of 1919 or of a later year.

In *International-Great Northern R.R. Co.*, *supra*, the taxpayer was awarded additional compensation for transporting the mails for the period November 1, 1916, to December 31, 1917. As is the case here, the award of the Interstate Commerce Commission was rendered on December 23, 1919, pursuant to the provisions of sections 5 and 6 of an act approved July 28, 1916, Post Office Department Appropriations, 39 Stat. 412, 425. The amount of the award was received by the taxpayer in 1920, and it accounted for the award on its books and in its tax return as income of that year. In disposing of the question as to whether the item belonged in the income of 1920 or of an earlier period, we held " That no possible basis existed for any other accrual [than that recorded on the books] is plainly indicated by the report of the Interstate Commerce Commission in Docket 9200, Railway Mail Pay, 56 I.C.C. 1. That a dispute existed can not be doubted, since the Post Office Department and the railroads contended for bases of computation widely different (56 I.C.C. 1) ;" and we left the item in 1920 income where the taxpayer had put it. The stipulated facts in the present case disclose that while the Interstate Commerce Commission's decision in Docket 9200, in the matter of railway mail pay, was made on December 23, 1919, that decision was not made public or served on the interested parties until January 15, 1920. In view of that fact, and since the act under which the award was made required the Commission " to fix and determine from time to time the fair and reasonable rates and compensation for the transporting of such mail matter by railway common carriers and the service connected therewith, prescribing the method or methods by weight, or space, or both, or otherwise, for ascertaining such rate or compensation," after opportunity to be heard had been afforded the carrier, it is evident that no basis existed prior to 1920 for the accrual of the additional compensation. Until the Commission had performed the duty with which it was charged by the act, there was no certainty that this petitioner would be entitled to or receive additional compensation. Under the circumstances, it seems clear that the item in question was not accruable or accountable as income prior to 1920. Of the whole amount paid to the petitioner as additional compensation, $259,971.82 was received in 1920 and $204,502.33 was received in 1921. As to the amount received in 1920, there can hardly be any question that it belongs in the taxable income of that year. As to the

amount received in 1921, the stipulated facts show only that it was received in that year and do not show the time of determination of the petitioner's right to receive it. On its books, the petitioner accounted for $461,956.56 as income for 1920, and there the respondent left it. In our opinion, the respondent's action in the matter is entirely correct.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

MURDOCK and ADAMS concur in the result.

---

SMITH, concurring: I concur in the result reached by the Board upon Issue IX. The statute permits a corporation to deduct from gross income " all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Sec. 234 (a), Revenue Act of 1918. It seems clear from the findings made upon this issue that the entire amount of $30,906,-508.93 expended by the petitioner for maintenance of its ways and structures during the last ten months of 1920 constituted ordinary and necessary expenses. The amount was so classified upon the petitioner's books of account, and as operating expenses in its report made to the Interstate Commerce Commission. There is no evidence that any part constituted capital expenditures. It can no more be said that $5,589,968.23 represented capital expenditures than it can be said that the entire amount represented capital expenditures.

In making these expenditures petitioner paid out its own funds. At the time it made the expenditures it had no assurance that it would in any wise be reimbursed for them in later years, and in fact there is no evidence that the petitioner was reimbursed. I think, therefore, that, regardless of whether the Director General made an allowance for undermaintenance during the period of Federal control, the petitioner is entitled to deduct the entire amount paid for maintenance of its ways and structures during the last ten-month period of 1920 as ordinary and necessary expenses.